**UNITED STATES FIDELITY & GUARANTY COMPANY**

v.

**UNITED STATES of America, Appellant.**

No. 87–5073.

United States Court of Appeals, Third Circuit.

Argued Sept. 9, 1987.

Decided Jan. 15, 1988.

---

Jonathan E. Butterfield (argued), Liebert, Short, Fitzpatrick & Hirshland, Williamsport, Pa., for appellee.

Richard K. Willard, Asst. Atty. Gen., James J. West, U.S. Atty., Jeffrey Axelrad, Phyllis Jackson Pyles (argued), Torts Branch, Civ. Div., U.S. Dept. of Justice, Ray E. Spears, Office of the General Counsel, U.S. Environmental Protection Agency, Washington, D.C., for appellant.

Before SLOVITER and STAPLETON, Circuit Judges, and FISHER, District Judge.*

OPINION OF THE COURT

STAPLETON, Circuit Judge:

The United States Fidelity & Guaranty Company (U.S.F. & G.) instituted this ac-

---

* Honorable Clarkson S. Fisher, United States District Judge for the District of New Jersey (Tren- ton), sitting by designation.

tion against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680 (1982). The action seeks recovery for losses arising from an accident that occurred during the cleanup of an abandoned chemical facility. After trial, the district court held that U.S.F. & G. could recover. Because we hold that the discretionary function exception, 28 U.S.C. § 2680(a) (1982), bars recovery against the United States in this case, we will reverse.

I.

The district court found the following facts. Drake Chemicals, Inc. (Drake) operated a chemical manufacturing facility in Lock Haven, Pennsylvania from 1961 until the company went bankrupt in 1981. When Drake ceased operations, it abandoned its manufacturing site, leaving numerous chemical drums, tanks, and reactors behind. The Pennsylvania Department of Environmental Resources inspected the Drake site and determined that the site posed a threat to the public health and to the environment. After attempting unsuccessfully to have Drake clean up the site, the Department requested the Environmental Protection Agency (EPA) to undertake a cleanup operation.

In February 1982, the EPA approved the Drake site for an "immediate removal action" pursuant to its authority under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601–9657 (1982) (CERCLA). The EPA typically undertakes an immediate removal action only if it determines that a response is needed within hours or days to prevent or mitigate significant harm to the public health or to the environment. After conducting an investigation, the EPA concluded that an imminent threat of fire and explosion existed at the Drake site, as well as a threat of public contact with hazardous chemicals.

The immediate removal action at the Drake site was directed by an On Scene Coordinator, an EPA employee, who selected OH Materials Handling Company (OH Materials), a private cleanup specialist, as the prime contractor for cleaning up the

Drake site. The On Scene Coordinator had primary responsibility for determining the nature and scheduling of the work to be done, the means of disposing of waste, and the expenditures of OH Materials for materials and manpower. In particular, the On Scene Coordinator had responsibility for directing and monitoring the activities of OH Materials.

One of the most serious hazards at the Drake site was an old railroad tank car resting on raised concrete pedestals. The tank contained oleum, a solution of sulfur trioxide in concentrated sulfuric acid, which is extremely reactive with a wide range of compounds and sensitive to moisture. At the commencement of the removal action, the oleum tank was venting directly into the atmosphere and posed a major threat of fire, explosion, and release of pollutants.

OH Materials suggested that the tank be removed from its pedestals and transferred to a remote location, or alternatively placed on the ground at the rear of the Drake site prior to neutralization and removal of the oleum. The On Scene Coordinator rejected these recommendations after considering the potential risks from moving the tank. OH Materials then suggested neutralizing the oleum in the tank by slowly draining all of the liquid oleum from the tank through the bottom valve into a container of water and allowing the oleum to react with the water in a controlled fashion. The remaining sludge inside the tank would then be neutralized by slowly adding water to the tank. Following the completion of the chemical reaction, the neutralized sludge would be drained. The On Scene Coordinator approved this plan.

On March 4, 1982, a hydrogeologist employed by the Commonwealth issued a report recommending that the more hazardous operations at the Drake site, such as those involving oleum, should be done on a sunny day with a north wind in excess of three knots. The reason for this recommendation was that the City of Lock Haven, with a population of approximately 15,000, is situated immediately to the north, west, and northeast of the Drake site, while areas to the south, southeast, and

east of the site are sparsely populated. The On Scene Coordinator was on notice of the hydrogeologist's report prior to the neutralization of the oleum tank.

On March 15, 1982, while the oleum was being drained from the tank through the bottom valve, a nut loosened and an uncontrolled flow of oleum escaped and began to react with the water in the tub below the tank. Employees of OH Materials tightened the valve, but not before a dense cloud of sulfur trioxide and sulfuric acid formed and migrated toward Lock Haven. Five Pennsylvania Department of Transportation workers suffered respiratory distress from exposure to the acid cloud.

After this incident, the On Scene Coordinator met with OH Materials and decided to continue neutralization in the manner originally approved. OH Materials proceeded to add water gradually to the oleum tank until the tank was completely filled with water and all evidence of reaction between the water and the contents of the tank ceased. OH Materials then began draining the supposedly neutralized material through the bottom valve.

On March 23, 1982, drainage stopped because the valve had become clogged with sludge. To clear the valve, OH Materials employees inserted rods through the manway at the top of the tank. Following the insertion of the rods, a steam explosion occurred in the oleum tank. A large cloud of sulfur trioxide and sulfuric acid escaped out of the manway. Blown by south-southwest winds, the acid cloud migrated into Lock Haven, where it caused property damage to over 500 motor vehicles, an airplane, and several buildings.

U.S.F. & G., the insurer for OH Materials, paid out $133,296.97 in claims arising out of the March 23 incident. U.S.F. & G. filed an administrative settlement claim with the EPA, which the EPA denied. U.S. F. & G. then filed this suit against the United States on September 20, 1984, seeking recovery of its losses from the March 23 incident. On February 13, 1986, without having submitted a separate administrative claim to the EPA, U.S.F. & G. filed an amended complaint adding a claim for $5000 of personal injury losses arising out of the March 15 incident. The United States then filed a motion to dismiss or for summary judgment on the ground that the discretionary function exception barred liability. The district court denied this motion.

After trial, the district court again concluded that the discretionary function exception did not apply. *See United States Fidelity & Guar. Co. v. United States,* 638 F.Supp. 1068, 1077 (M.D.Pa.1986). In addition, the court dismissed the personal injury claims arising out of the March 15 incident, because U.S.F. & G. never submitted these claims to the EPA as required by 28 U.S.C. § 2675 (1982). *See id.* at 1077–78. With respect to the March 23 incident, the court rejected the arguments that the United States was negligent in leaving the oleum tank on its pedestals before neutralization and in continuing with the neutralization procedure after the March 15 incident. *See id.* at 1079–80. The court did find, however, that the United States was negligent in "failing to take wind conditions into account while supervising the neutralization of the oleum tank." *Id.* at 1084. The court held that the Government was liable for 60% of the damage arising out of the March 23, 1982 incident.

The United States appeals on several grounds. We address only the Government's contention that the discretionary function exception bars recovery, because our disposition of this issue renders unnecessary a discussion of the other issues raised on appeal. The scope of review of the applicability of the discretionary function exception is plenary. We have jurisdiction under 28 U.S.C. § 1291 (1982).

## II.

The Federal Tort Claims Act waives the sovereign immunity of the United States in claims "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b) (1982). The statute, however, contains an exception for

"[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a) (1982). If governmental conduct falls within the discretionary function exception, it is irrelevant whether the United States abused its discretion or acted negligently.

In defining the scope of the discretionary function exception, the Supreme Court has recently stated the general rule that

> it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case.... Thus, the basic inquiry concerning the application of the discretionary function exception is whether the challenged acts of a Government employee—whatever his or her rank—are of the nature and quality that Congress intended to shield from tort liability.

*United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 813, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984).

*Varig* reaffirmed the construction of the discretionary function exception set forth in *Dalehite v. United States,* 346 U.S. 15, 28, 73 S.Ct. 956, 964, 97 L.Ed. 1427 (1953). *Dalehite* held that governmental conduct falling within the discretionary function exception "includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion." *Id.* at 35–36, 73 S.Ct. at 968 (footnote omitted), *quoted in Varig,* 467 U.S. at 811, 104 S.Ct. at 2763. The purpose of exempting decisions in which there is room for policy judgment and decision is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Varig,* 467 U.S. at 814, 104 S.Ct. at 2765.

█ In interpreting the Supreme Court's pronouncements in *Dalehite* and *Varig,* this court has developed several principles for determining whether governmental conduct is discretionary within the meaning of the exception. In the first place, conduct cannot be discretionary if it violates the Constitution, a statute, or an applicable regulation. Federal officials do not possess discretion to violate constitutional rights or federal statutes. *Pooler v. United States,* 787 F.2d 868, 871 (3d Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 175, 93 L.Ed.2d 111 (1986). In addition, an agency's violation of its own mandatory regulations is not a discretionary act. *Berkovitz by Berkovitz v. United States,* 822 F.2d 1322, 1332 (3d Cir.1987), *petition for cert. granted,* —— U.S. ——, 108 S.Ct. 692, 98 L.Ed.2d 645 (1987).

█ Second, it is irrelevant whether the government employee actually balanced economic, social, and political concerns in reaching his or her decision. In *Smith v. Johns–Manville Corp.,* 795 F.2d 301, 308–09 (3d Cir.1986), we stated that "[t]he test is not whether the government actually considered each possible alternative in the universe of options, but whether the conduct was of the type associated with the exercise of official discretion." This rule corresponds with the holdings of several other courts of appeals. In *Myslakowski v. United States,* 806 F.2d 94, 97 (6th Cir. 1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1608, 94 L.Ed.2d 793 (1987), the Court of Appeals for the Sixth Circuit held that

> even the negligent failure of a discretionary government policymaker to consider all relevant aspects of a subject matter under consideration does not vitiate the discretionary character of the decision that is made.

Indeed, it is, in part, to provide immunity against liability for the consequences of negligent failure to consider the relevant, even critical, matters in discretionary decisionmaking that the statutory exception exists. If it were otherwise, a judgment-based policy determination made at the highest levels, to which

all would concede that the statutory exception applies (the decision to sell surplus jeeps), would result in no immunity if the decision could be shown to have been made without consideration of important, relevant factors, or was a decision negligently reached. If that reasoning were sound, the discretionary function exception would be inapplicable in every case in which a negligent "failure to consider" a relevant risk could be proved.

*Accord Allen v. United States,* 816 F.2d 1417, 1422 n. 5 (10th Cir.1987) (quoting *Myslakowski* and stating that it is "irrelevant whether the alleged failure to warn was a matter of 'deliberate choice' or a mere oversight"), *petition for cert. denied,* — U.S. —, 108 S.Ct. 694, 98 L.Ed.2d 647 (1987); *In re Consolidated United States Atmospheric Testing Litigation,* 820 F.2d 982, 998 & n. 19 (9th Cir.1987) (quoting *Allen* and *Myslakowski* and holding that the exception "does not require an analysis of the decisionmaking process"). Thus, the relevant question is not whether an explicit balancing is proved, but whether the decision is susceptible to policy analysis.

 Third, although the discretionary function exception "plainly was intended to encompass the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals," *Varig,* 467 U.S. at 813–14, 104 S.Ct. at 2764, regulatory conduct is neither necessary nor sufficient for the application of the discretionary function exception. Not all regulatory acts are discretionary. *See Berkovitz,* 822 F.2d at 1327–28. Moreover, not all conduct falling within the exception is regulatory. Acts of a governmental nature also include " 'other administrative action not of a regulatory nature, such as the expenditure of Federal Funds, the execution of a Federal project and the like.' " *Dalehite,* 346 U.S. at 27, 73 S.Ct. at 963 (quoting Hearings on H.R. 5373 and H.R. 6463 before the House Committee on the Judiciary, 77th Cong., 2d Sess., 28, 33 (1942) (statement of Assistant Attorney General Francis M. Shea)) (footnote omit-

ted), *quoted in Varig,* 467 U.S. at 810, 104 S.Ct. 2762.

Finally, the decisions of the Supreme Court and this court reveal that the dichotomy between planning level and operation level conduct does not resolve the question of whether a governmental act is discretionary within the meaning of the exception. Although the Supreme Court in *Dalehite* did suggest that planning level decisions are discretionary and distinguished these decisions from operational decisions, *see* 346 U.S. at 42, 73 S.Ct. at 971, *Dalehite* neither states nor implies that all operational decisions are nondiscretionary. In fact, *Dalehite* states that "[n]ot only agencies of government are covered [by the exception] but all employees exercising discretion." *Id.* at 33, 73 S.Ct. at 966–67 (footnote omitted). *Varig* reinforced this conclusion by putting the focus on "the nature of the conduct, rather than the status of the actor." 467 U.S. at 813, 104 S.Ct. at 2764.

 In addition, this court in *Berkovitz* noted that operational conduct can be discretionary within the meaning of the exception. 822 F.2d at 1329. Acts at the operational level may be discretionary if planning level orders anticipate decisions at lower levels that leave room for policy judgment and decision. *See Pooler,* 787 F.2d at 871 (officer in charge of investigation had discretion in deciding how to pursue investigation, since "he had to exercise judgment as to the policy decision to use an informant and as to the extent of control which should be maintained over the selected informant"). Moreover, operational acts mandated by orders of planning level superiors are protected by the exception even though the actual actor does not exercise discretion. *Dalehite,* 346 U.S. at 36, 73 S.Ct. at 968 ("acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable"), *cited in Varig,* 467 U.S. at 820, 104 S.Ct. at 2768.

### III.

With these principles in mind, we now turn to the specific facts of this case. Al-

though the complaint alleged several theories of negligence on the part of the United States, the district court found the Government negligent only in its conduct concerning the timing of the neutralization of the oleum tank. In particular, the district court held that the Government should have scheduled the oleum removal operation at a time when the wind was not blowing toward the city. Since U.S.F. & G. does not appeal the district court's holding, we restrict our discussion to this single decision by the Government.

In *Dalehite*, the Supreme Court found that the Government's conduct in manufacturing fertilizer and loading it onto a ship where it later caught fire and exploded was protected by the discretionary function exception. The fertilizer, which contained an explosive ammonium nitrate base, had been manufactured and was being shipped pursuant to a federal program the ultimate objective of which was to provide food for countries occupied by the United States after World War II. One of the negligent acts found by the district court to be a proximate cause of the explosion was a decision by the Field Director of Ammunition Plants to bag the fertilizer at a temperature of 200 degrees Fahrenheit. The Supreme Court held this decision to be within the discretionary function exception because it was the kind of decision that required the decisionmaker to weigh the risk of fire and explosion inherent in bagging at this temperature against the "greatly increased production costs and/or greatly reduced production" that would attend bagging at a lower temperature. 346 U.S. at 41, 73 S.Ct. at 970. The Supreme Court observed that "[t]his kind of decision is not one which the courts, under the Act, are empowered to cite as 'negligence.'" *Id.*

■ We perceive no material distinction between the decision challenged in *Dalehite* and the one attacked here. The objective of this phase of the CERCLA program is to protect the public from the dangers of abandoned toxic waste. Execution of that program and accomplishment of its objective necessarily require the setting of prior-

ities in light of the risks presented at various sites and the finite resources available to address the problem. In this instance, the EPA classified the cleanup operation at the Drake site as an "immediate removal action." The agency thus determined that significant risks would attend a delay in cleanup.

With this hazard identified and this priority fixed, the On Scene Coordinator was dispatched with authority to determine how to schedule the cleanup operations at the Drake site in a manner that would most safely and effectively minimize the risk of serious injury to the public. In particular, the On Scene Coordinator faced the problem of when to schedule the neutralization of an oleum tank that was venting directly into the atmosphere and posed a major threat of fire, explosion, and release of pollutants into the air. In this context, one would expect the scheduling decision to reflect not only the available resources and the other hazards to be neutralized on the site, but most importantly, a balancing of the risks of proceeding with the neutralization on the day chosen against the risks of further delay. Thus the authority delegated to the On Scene Coordinator left room for, and indeed required, the exercise of policy judgment based upon the resources available and the relative risks to the public health and safety from alternative actions.

As a result, we view the challenged decision here as involving as much or more of a discretionary function as the bagging temperature decision in *Dalehite*. In the words of *Dalehite*, the On Scene Coordinator's alleged negligence came in the context of "the execution of a Federal project," 346 U.S. at 27, 73 S.Ct. at 963, and involved a "determination[ ] made by ... [an] administrator[ ] ... establishing ... [a] schedule[ ] of operations", *id.* at 35–36, 73 S.Ct. at 968, for the project. Under the Act, we are not "empowered to cite as 'negligence,'" *id.* at 41, 73 S.Ct. at 970, such a decision.

In its opinion, the district court acknowledged that "[i]t is conceivable that under certain circumstances the hazard posed by a tank would be so great that removal operations would have to proceed immedi-

ately and without regard to wind conditions." 638 F.Supp. at 1080. But the court went on to second-guess the On Scene Coordinator's decision in this particular case by finding it to be negligent. Under this court's analysis in *Smith*, however, the fact that there was no evidence of an actual policy determination by the On Scene Coordinator taking wind conditions into account does not affect the nature of the decision. Once the district court found that there could be room for a policy judgment, it should have ended its analysis.

None of the circumstances rendering governmental conduct nondiscretionary was present in this case. There was no applicable constitutional provision, statute, or regulation requiring the On Scene Coordinator to undertake removal actions only on days with favorable wind conditions. The report of the Commonwealth's hydrogeologist did not impose a nondiscretionary, mandatory duty on the On Scene Coordinator. The report represented the opinion of one expert that the On Scene Coordinator had the authority to accept, reject, or balance against other considerations.

In addition, U.S.F. & G. does not suggest that the On Scene Coordinator's decision involved any violation of a superior's instructions. CERCLA and the EPA give the On Scene Coordinator broad responsibility to formulate the best means of achieving the statute's goals. Thus, even if the On Scene Coordinator's decision could be classified as operational, it was nevertheless discretionary. The timing decision was one that called for a policy judgment.

U.S.F. & G. cites two Supreme Court cases in response to the analysis set forth above: *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) and *Rayonier, Inc. v. United States*, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed. 2d 354 (1957). In *Indian Towing*, the Supreme Court held that the Government could be held liable for the Coast Guard's negligence in operating a lighthouse. In *Rayonier*, the Court held that the Government could be held liable for the negligence of Forest Service employees in fighting

fires originating on federal lands. But these cases do not control here because neither one involves an interpretation of the discretionary function exception. The Court in *Varig* distinguished *Indian Towing* because the Government in that case conceded that the discretionary function exception did not apply, and argued instead (to no avail) that the Coast Guard was protected against liability in the operation of a lighthouse because it was a "uniquely governmental function." 467 U.S. at 812, 104 S.Ct. at 2763. The *Varig* Court distinguished *Rayonier* because *Rayonier* did not discuss or rely upon the discretionary function exception; rather, it relied on, and overruled *Dalehite*'s reading of, 28 U.S.C. § 2674, which allows recovery against the United States "in the same manner and to the same extent as a private individual under like circumstances." *Rayonier* held only that under the Act the United States cannot claim immunity from liability for the negligence of its fire fighters on the ground the local governments generally enjoy such immunity for the negligence of their fire fighters. *See Varig*, 467 U.S. at 813 n. 10, 104 S.Ct. at 2764 n. 10. We must adhere to the Court's admonition in *Varig* that the principles developed in *Dalehite* still govern the interpretation of the discretionary function exception. *Cf. Mahler v. United States*, 306 F.2d 713, 723 n. 13 (3d Cir.1962) (decided before *Varig*, stating that *Dalehite*'s approach to analyzing the discretionary function exception survived *Indian Towing* and *Rayonier*).

### IV.

Because the discretionary function exception bars recovery against the United States in this case, the decision of the district court will be reversed.