**UNITED STATES of America, Plaintiff,**

**v.**

**IRON MOUNTAIN MINES, INC., T.W. Arman, and Rhone Poulenc Basic Chemicals Co., Defendants.**

**STATE OF CALIFORNIA, Plaintiff,**

**v.**

**IRON MOUNTAIN MINES, INC., T.W. Arman, and Rhone Poulenc Basic Chemicals Co., Defendants.**

Nos. CIV–S–91–768 DFL, CIV–S–91–1167 DFL.

United States District Court, E.D. California.

March 31, 1995.

**1434**

Paul B. Galvani, Jeffrey B. Storer, Ropes & Gray, Boston, MA, Thomas G. Redmon, Matthew W. Powell, Wilke, Fleury, Hoffelt, Gould & Birney, Sacramento, CA, for Rhone Poulenc Basic Chemicals Co.

Michael Brian Hingerty, U.S. E.P.A., David B. Glazer, U.S. Dept. of Justice, Environmental Enforcement Section, San Francisco, CA, Martin F. McDermott, U.S. Dept. of Justice, Land and Natural Resources Div., Washington, DC, Yoshinori H.T. Himel, Asst. U.S. Atty., Sacramento, CA, for U.S.

Mary Elizabeth Hackenbracht, Margarita Padilla, California State Atty. Gen., Oakland, CA, for State of Cal.

## MEMORANDUM OF OPINION AND ORDER

LEVI, District Judge.

This case concerns the allocation of costs for the cleanup of the Iron Mountain Mine ("the mine"). Plaintiffs are the United States and the State of California, who are suing under CERCLA[1] to recover response costs for cleanup activities at the mine. Defendants are Iron Mountain Mines, Inc. and T.W. Arman ("IMMI/Arman"), the current owners of the mine, and Rhone Poulenc Basic Chemicals Co. ("RP"), the corporate successor to Mountain Copper, Co., Ltd., the previous owner of the mine.[2] RP has filed CERCLA and state law counterclaims and third-party claims against the United States and the State of California.[3] The United

---

**1.** The Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 *et seq.*

**2.** Stauffer chemical company purchased Iron Mountain Mine from Mountain Copper, Co., Ltd. in 1967 as part of a corporate reorganization.

Stauffer then sold the mine to IMMI/Arman in 1976. RP is the corporate successor to Stauffer.

**3.** IMMI/Arman has filed counterclaims and third-party claims against the United States based on the government's ownership and operation of the dams and power plant. IMMI/Arman has chosen to rely on RP's briefing of this motion, and

States and the State of California now move to dismiss these counterclaims and third party claims under Rule 12(b)(1) for lack of subject matter jurisdiction based on various theories of immunity, and under Rule 12(b)(6) for failure to state a claim.

## I. *Background*

Iron Mountain is located nine miles northwest of Redding, California. From the late 1800's until 1962, the mountain was mined for gold, copper, zinc and pyrite. The extensive mining exposed sulfide deposits, which react with rainwater and groundwater to form acid mine drainage ("AMD"), a pollutant harmful to fish. The AMD flows into two creeks, and they in turn flow into Spring Creek. Spring Creek terminates in the Spring Creek reservoir behind the Spring Creek Dam, a project constructed in 1963 by the United States Bureau of Reclamation ("USBR"). The Spring Creek Power Plant was constructed at about the same time by the USBR and is located on Spring Creek just downstream of the dam. The Spring Creek Dam releases AMD-tainted water into the Keswick Reservoir at a point on the Sacramento River between the Shasta Dam (upstream) and the Keswick Dam (downstream).

### A. *Claims against the United States*

#### 1. *Ownership and Operation of Dams and Power Plant*

RP contends that the United States is liable for response costs associated with the release of AMD from Iron Mountain Mine because of its construction and operation of the Shasta, Keswick and Spring Creek Dams and the Spring Creek Power Plant. (RP Third Am.Countercl.—U.S. ¶ 9.) RP's claim rests on the theory that had the United States not dammed the Sacramento River and Spring Creek, the natural flow of the watershed would have diluted the AMD and

the parties have treated IMMI/Arman's claims as identical to RP's. In conformity with the parties' practice, this order refers only to RP's claims. However, the order applies equally to the claims of IMMI/Arman.

4. Because this is a motion to dismiss, all facts alleged by RP are presumed to be true.

there would have been no response costs. (*Id.* ¶ 10.) [4] In its counterclaim, RP paints a picture of failure upon failure by the USBR to control the pollution problems stemming from the construction of the Shasta Dam in the 1940s. According to RP, when the Keswick Dam was built in 1950 for the purpose of regulating the flow from the Shasta Dam, it had the effect of catching and impounding hazardous sediments from Spring Creek. (*Id.* ¶ 12.) The Spring Creek Dam was built in 1963 both to prevent debris from clogging the Spring Creek Power Plant and to remedy the AMD problem created by the mine and the Shasta and Keswick dams. (*Id.* ¶ 13.) According to RP, the Spring Creek Dam is itself composed partly of sediments containing hazardous substances, and the USBR disposed of hazardous sediments elsewhere in the facility during its construction. (*Id.* ¶ 14.) RP also alleges that the Spring Creek Dam is too small to sufficiently dilute the AMD runoff without coordinating releases from the Spring Creek Dam with releases from the Shasta Dam, and, according to RP, this coordination has been lacking.[5] In the language of CERCLA, RP contends that the United States is liable as an owner or operator of the dams, behind which AMD concentrates, or as an arranger since the Spring Creek Dam was built in part to dispose of the AMD. (*Id.* ¶¶ 21–24.)

#### 2. *Activities During and After World War II*

As an alternative basis for liability, RP claims that the United States is liable for response costs because of the government's involvement in the mine during and after World War II. According to RP, when the war began, there had been no copper mining at Iron Mountain since 1930, and mining was limited to surface mining for gold and intermittent mining for pyrite. (*Id.* ¶¶ 27–28.)

5. RP alleges that the USBR has mismanaged the various dams and the power plant by failing to coordinate releases of the dams to minimize the metals content in the river (*id.* ¶ 19), once lowering the water in the Keswick reservoir to an abnormally level and flushing a slug of sediment containing hazardous substances downstream (*id.* ¶ 20), and failing to keep the louvers of Spring Creek Dam in proper condition (*id.* ¶ 17).

By directive, the government prohibited gold mining as not essential to the war effort. (*Id.* ¶ 28.) The government also established the Premium Price Plan as an incentive for the production of copper and zinc; prices were set to encourage maximum production. (*Id.* ¶ 32.) Having been told to cease gold mining, Mountain Copper (then owner of the mine) contracted to sell its entire copper and zinc output to the government. The government controlled marketing and pricing of the ore produced. (*Id.* ¶ 29, 32–33.) Under the contract, a new ore body was opened at the mine, a new mill was built, and pyrite ore removal increased. (*Id.* ¶¶ 29–31, 34.) If Mountain Copper had not increased pyrite production, the government could have seized the mine to assure production. (*Id.* ¶ 34.) RP alleges additional government involvement with the mine during the war affecting the labor force and shipment of the metals.[6]

After the war, the mining and milling of copper and zinc ore ceased, but RP contends that the government continued its involvement with the mine. According to RP the government paid for equipment and operations in conducting explorations for new ore and participated in decisions as to the best methods to search for new ore. (*Id.* ¶ 39.)

### 3. RP's Claims against the United States

Based on these allegations, in Counts I and II of its counterclaim, RP claims response costs under CERCLA § 107(a) and contribution under CERCLA § 113(f) and common law.[7] RP contends that the United States is liable as owner and operator of the dams and power plant, which are part of the facility or facilities in which response costs have been incurred, and that the United States is further liable as an arranger and transporter.

RP also claims that the United States' activities during and after World War II render the United States liable as an operator and arranger. (RP Third Am.Countercl.—U.S. ¶¶ 1–2, 41–47.) In Count III, RP avers that if it is liable to the United States, the award should be reduced in recoupment under CERCLA, common law, and equitable indemnification. In Counts I and II of its Amended Third–Party Complaint Against the United States, RP requests contribution and indemnification under CERCLA and common law with respect to any liability RP might incur to the State of California.[8]

### B. Claims against the State of California

RP contends that the State of California is also liable for the response costs associated with the mine. RP claims the State "has actively participated in the operation of the Shasta and Keswick Dams." (RP Am.Countercl.—Cal. ¶ 6.) In particular, RP alleges that officials from the State's Central Valley Regional Water Pollution Control Board and Department of Fish and Game met with USBR officials to agree on operating plans for releases from the dams. RP also asserts that the State operates the Spring Creek Dam along with the USBR, and thereby shares responsibility for the release of polluted water from Spring Creek into the Sacramento River. RP's claim as to the Spring Creek Dam is based upon alleged agreements and contacts between the State and USBR concerning operation of the dam. (*Id.* ¶¶ 9, 11, 14, and 15.)

RP further asserts that the State has not fulfilled its public trust duty of supervising appropriated water. According to RP, the State has: (1) failed to require the USBR to

---

6. RP claims that the government inspected the mine in 1943 to eliminate hazards that could interrupt production and to install measures to guard against sabotage. (*Id.* ¶ 37.) Additionally, RP asserts that the government hired workers for the mine, granted deferments to mine workers and furloughed active military personnel for work at the mine. (*Id.* ¶ 38.) The government surfaced and improved Mountain Copper's road to Keswick, to facilitate shipments from the mine, (*id.* ¶ 32), and the government refused to permit the Southern Pacific Railroad to abandon the rail line linking Iron Mountain to Redding. (*Id.* ¶ 38.)

7. Sections 107 and 113 are codified at 42 U.S.C. §§ 9607 and 9613. In the remainder of this opinion all citations to CERCLA will be to the codified statute.

8. RP also claims the United States is the record owner of at least four parcels of land in the area of Iron Mountain Mine. (*Id.* ¶¶ 5–7.) RP claims that AMD drains from these parcels owned by the United States. On this motion, the United States does not seek dismissal of these claims. (United States Mem. at 2 n. 4.)

coordinate the operation of the dams to minimize environmental harm, (*id.* ¶ 16); (2) failed to repair the louvers on the Spring Creek Dam that would have minimized release of AMD during storms, (*id.* ¶ 17); and (3) wasted dilution water by diverting it from Spring Creek with the result that in 1992 the Spring Creek Dam overflowed, releasing toxic waters, (*id.* ¶ 18).

Finally, RP alleges that the State owns the streambed of Spring Creek below the Spring Creek Dam and the streambed of the Sacramento River in the Shasta and Keswick areas. Because hazardous substances are located in the streambeds, RP asserts that the State is an owner of a "facility" from which a release of pollution has occurred. (*Id.* ¶¶ 22–25.)

Based on these allegations, RP asserts numerous counterclaims against the State. Counts I and II are CERCLA claims based on the State as an owner and operator, respectively, of facilities—the dams and the streambeds—from which hazardous substances have been released. Count III claims that the State is an arranger under CERCLA; Count IV makes a CERCLA contribution claim. RP also asserts state law claims for negligence (Count V), nuisance (Count VI), creation of a dangerous condition on public property (Count VII), breach of public trust (Count VIII), breach of mandatory duty (Count IX), and equitable indemnification (Count XI). Count X is a recoupment counterclaim which incorporates all other claims.

### C. *Procedural History*

The United States' complaint was filed on June 12, 1991; the State of California's complaint was filed on August 29, 1991. The two cases were consolidated by Order of November 21, 1991. In *United States v. Iron Mountain Mines, Inc.*, 812 F.Supp. 1528 (E.D.Cal.1992), Judge Schwartz, who was first assigned to this case, held that mining waste was excluded from the coverage of CERCLA under the Bevill Amendment. The CERCLA claims against RP and IMMI/Arman were dismissed on this basis, (*see* Order of May 11, 1993, and Order of August 23, 1993). However, the plaintiffs'

complaints were reinstated after the Ninth Circuit held that releases of wastes listed in the Bevill Amendment may create liability under CERCLA. *See Louisiana–Pacific Corp. v. ASARCO, Inc.*, 24 F.3d 1565 (9th Cir.1994).

Subsequently, RP filed its Amended Third–Party Complaint and Third Amended Counterclaim against the United States, and its Amended Counterclaim against the State of California. The United States and the State now move to dismiss RP's claims. Relying on sovereign immunity doctrines, the United States moves to dismiss those of RP's claims that are based on the USBR's ownership and operation of the three dams and the power plant. The United States advances two main arguments in support of its motion: (1) all claims are barred by section 3 of the Flood Control Act of 1928 (33 U.S.C. § 702c); and (2) the CERCLA claims regarding the Spring Creek Dam are barred by sovereign immunity because the dam serves a remedial purpose and CERCLA exempts the government from liability when it acts in a governmental or remedial capacity. (United States Mem. at 1–2.) The State similarly moves to dismiss RP's counterclaims concerning its involvement in the operation of the dams. Resting on the Eleventh Amendment and the same case law relied upon by the United States, the State contends that CERCLA does not abrogate its immunity under the Eleventh Amendment when it acts in a remedial or regulatory capacity. The State also moves to dismiss these claims on the basis that they do not state a claim for operator or arranger liability under CERCLA. As to RP's claims under CERCLA relating to the United States' activity at the mine during and after the war, the United States seeks dismissal arguing that the complaint fails to state a claim because the allegations, if true, fall short of claiming that the United States had managerial authority over the mine or the disposal of waste. Finally, the United States and the State move for dismissal of RP's recoupment claims.

### II. *Immunity Under § 702c*

Section 3 of the Flood Control Act, 33 U.S.C. § 702c, provides in relevant part that "[n]o liability of any kind shall attach to or

rest upon the United States for any damage from or by floods or flood waters at any place." The United States argues that all of RP's claims based on the construction and operation of the three dams and the power plant are barred by this provision. There are two major points of dispute between the parties concerning application of § 702c to the circumstances here: (1) whether the waters at the Shasta, Keswick, and Spring Creek Dams, and at the Spring Creek Power Plant, are "flood waters" within the terms of § 702c; and (2) if so, whether CERCLA supersedes the § 702c immunity.

### A. Scope of § 702c

■ The government claims the immunity in § 702c on the basis that all of the waters at issue are either part of flood control projects or are gathered and released in coordination with flood control projects. RP argues that the immunity does not apply because the damage of which it complains was not caused by waters released for reasons of flood control. Specifically, RP argues that the Spring Creek Dam was built to control AMD and to assist the Power Plant and not for flood control. RP also contends that it was the decision to build the Shasta and Keswick dams and the concentration and then release of hazardous sediments that has been the cause of damage, not the release of flood waters. RP further maintains that the Spring Creek Dam was built with AMD tainted soil and that it was this action by the USBR, as opposed to the release of flood waters, that has been the source of damage. Finally, RP contends that uneven releases of water from the Spring Creek Power Plant stir up contaminated sediments, causing their release into the Keswick reservoir. RP's arguments fail in the face of the broad and emphatic language in § 702c and the broad interpretation consistently given to that language in the Supreme Court and the Ninth Circuit.

In *United States v. James,* 478 U.S. 597, 106 S.Ct. 3116, 92 L.Ed.2d 483 (1986), the Supreme Court examined the scope of the government's immunity under § 702c. The case involved a claim brought under the Federal Tort Claims Act for injuries sustained by plaintiffs when they were pulled through the underwater gates of a dam while waterskiing at a reservoir. *Id.* at 598–600, 106 S.Ct. at 3118. The Court found that § 702c was not limited to property damage but applied to any damage including a claim of personal injury caused by negligence. As to the definition of "flood waters" under the section, the Court held that the term was unambiguous:

> The Act concerns flood control projects designed to carry floodwaters. It is thus clear from § 702(c)'s plain language that the terms "flood" and "flood waters" apply to all waters contained in or carried through a federal flood control project for purposes of or related to flood control, as well as to waters that such projects cannot control.

*Id.* at 605, 106 S.Ct. at 3121. The Court also found that its reading of the statutory language was consistent with the legislative history and purpose: "the sweeping language of § 702c was no drafting inadvertence. Congress clearly sought to ensure beyond doubt that sovereign immunity would protect the government from 'any' liability associated with flood control." *Id.* at 608, 106 S.Ct. at 3122 (citation omitted). Thus, the Court held that the negligent failure to warn plaintiffs of the danger of boating too close to the dam was part of the management of a flood control project and was within the immunity. *Id.*

In keeping with the sweeping language of § 702c, the Ninth Circuit has also interpreted the immunity broadly. Under Ninth Circuit case law the immunity applies if the damage sustained is "not wholly unrelated" to the use of a flood control project:

> the immunity provision of § 702c does not apply when the damage or injury is "wholly unrelated to any Act of Congress authorizing expenditures of federal funds for flood control".... So long as a project is authorized by Congress for flood control purposes, and the damage or injury is related to the use of that project, immunity continues to attach.

*McCarthy v. United States,* 850 F.2d 558, 562 (9th Cir.1988) (quoting *Morici Corp. v. United States,* 681 F.2d 645, 647 (9th Cir.1982), and *Peterson v. United States,* 367 F.2d 271,

275 (9th Cir.1966)) (internal citations omitted). Under the "wholly unrelated" test, the fact that a flood control project may have multiple purposes does not affect the government's immunity. This much is plain from *James* where the injured parties were using the reservoir for recreation. *See McCarthy*, 850 F.2d at 562. What may be less certain from *James* is whether the immunity may only be claimed if the injury stems from a particular release of flood waters for the purpose of flood control. The injuries in *James* were caused by the Corps of Engineers' decision to release waters from reservoirs that had reached the flood stage. Thus, the Court had no occasion to consider whether the immunity depended on this factor although it did reject plaintiffs' parallel argument that the government's failure to warn could be viewed as a separate activity "wholly unrelated" to flood control. This issue, however, is resolved in the Ninth Circuit; in *Morici* and then *McCarthy* the court expressly rejected "the notion that the applicability of the immunity provision in cases involving multi-purpose projects depends upon the particular use to which the project was being put when the negligence occurred." *McCarthy*, 850 F.2d at 562. *See Fryman v. United States*, 901 F.2d 79, 82 (7th Cir.1990) (noting that the Ninth Circuit's interpretation of § 702c may be broader than that stated by the Supreme Court in *James* ). Under the "wholly unrelated" test if one of the purposes of the project is flood control then immunity applies when "waters contained in a federal flood control project for purposes related to flood control were a substantial factor in bringing about" the injury. *McCarthy*, 850 F.2d at 561–62. In the context of this case, the "wholly unrelated" test may be stated as follows: if the waters behind the Shasta, Keswick, and Spring Creek dams are not wholly unrelated to a flood control project, immunity will apply if these waters are a substantial factor in bringing about the injury caused by AMD even if the purpose of some of the water releases was for a reason other than flood control. In

short, the court rejects RP's contention that the immunity hinges upon a showing that the damage was caused by a particular release of water for the very purpose of flood control.[9]

■ Once the test is stated in this fashion, RP's claims readily fall within the immunity provided by § 702c. The Shasta and Keswick Dams are part of the Central Valley Project, which Congress authorized for flood control purposes. *See Morici Corp. v. United States*, 491 F.Supp. 466, 489 (E.D.Cal. 1980) ("The Shasta and Keswick facilities are, indisputably, multi-purpose facilities which are devoted in part to flood control."), *aff'd*, 681 F.2d 645, 648 (9th Cir.1982) (Central Valley Project "was authorized by Congress for flood control purposes"). The Spring Creek Dam and Power Plant are part of a different project known as the Trinity River Diversion. Although the Trinity River Diversion was authorized by Congress principally as an irrigation project, it was also to be operated as an integral part of the Central Valley Project. *See Morici*, 491 F.Supp. at 490–91 (discussing legislative history of the Trinity River Diversion and the Central Valley Project). As the court noted in *Morici*, "[t]he Central Valley Project is operated as an integrated whole, rather than as a number of separate, isolated parts, because water releases at any one facility must be coordinated with releases at other facilities in that river basin." *Morici*, 491 F.Supp. at 490. Because of this interrelationship, which RP does not dispute, the operation of the Spring Creek Dam and Power Plant must be considered part of the Central Valley Project, or at least as integrally related to that project. Indeed, RP's theory of liability suggests this very interrelation: RP contends that the AMD problem stems ultimately from construction of the Shasta Dam which, because of reduced river flows and increased concentration of pollutants, in turn required construction of the Spring Creek Dam. From this vantage the Spring Creek Dam and reservoir is related to a flood control

---

9. Were RP's position accepted, it would sound the death knell of § 702c immunity in the context of environmental injury, for as a practical matter the government would rarely be able to associate environmental damage with particular releases undertaken for flood control.

project just as much as if it had been built as part of the Central Valley Project.[10]

All of the injury claimed by RP is subject to the immunity because all of the injury is attributable, or at least not "wholly unrelated," to waters collected and released as part of a federal flood control project. Thus, the injury which resulted from the decision to build the Shasta and Keswick Dams, with the consequent limitation on river flows and the build up of tainted sediment behind the Keswick Dam, is covered by the immunity since the sediments are carried by flood waters and the build up and concentration of the sediments are directly related to the use of a flood control project. Similarly, the alleged use of tainted soils to build the Spring Creek Dam is within the scope of the immunity since the damage is caused by the release of waters that are managed for flood control, as part of the Central Valley Project, and because the dam itself was constructed because of the Central Valley Project. Finally, the injury allegedly caused by the Power Plant— surges of water which in combination with releases from Spring Creek stir up contaminated sediments that travel into Keswick reservoir—is not "wholly unrelated" to a flood control project because it is the combination of water from the Power Plant and from the Dam that causes the problem. Moreover, the Power Plant, like the power plant at the Shasta Dam, is part of the Central Valley project, *see Morici,* 491 F.Supp. at 490–91, and thus releases of water from the Power Plant are related to a flood control project.

■ Thus, as an initial matter, the United States is entitled to sovereign immunity under § 702c with respect to all of RP's counterclaims arising from ownership and operation of the dams and power plant. The United States may be liable only if CERCLA supersedes this immunity.[11]

**B.   CERCLA Abrogates § 702c Immunity**

■ Section 120(a)(1) of CERCLA provides:

> Each department, agency, and instrumentality of the United States (including the executive, legislative, and judicial branches of government) shall be subject to, and comply with, this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under Section 9607 of this title.

Furthermore, *Sumner Peck* is readily distinguishable on its facts, which involve water seeping from irrigation district canals far removed from any structures that had flood control purposes. The nexus between the damage and the flood control purpose of the project is attenuated. By contrast, here all of the dams are interrelated and are either part of the Central Valley Project or operate in close association with that Project while the alleged damage stems directly from releases of water and constriction of river flows.

10. RP relies on *Sumner Peck Ranch, Inc. v. Bureau of Reclamation,* 823 F.Supp. 715 (E.D.Cal. 1993) to argue that the immunity only attaches if the particular waters causing damage "are contained or carried through the project for 'purposes of or related to flood control.'" *Id.* at 744–45. RP is correct that *Sumner Peck* appears to add as an additional requirement for immunity that the purpose of the water's conveyance be flood control. This additional requirement is not supported by Ninth Circuit case law. Although there may be some question how broadly to read *James,* in the Ninth Circuit, as discussed in text, it suffices for the immunity that the project is a flood control project and that the damage is related to the use of the project. *See McCarthy v. United States,* 850 F.2d 558, 562 (9th Cir.1988); *Morici Corp. v. United States,* 681 F.2d 645, 647 (9th Cir.1982). By adding an additional requirement for immunity *Sumner Peck* follows more nearly the rule adopted in the Fourth Circuit in *Hayes v. United States,* 585 F.2d 701 (4th Cir. 1978). However, *Hayes* has been expressly rejected in both *McCarthy* and *Morici.* As the court noted in *Morici,* "it is very difficult, if not impossible, as a practical matter to segregate particular ... water releases into precise categories of purpose." *Morici,* 681 F.2d at 648 (quoting *Sanborn v. United States,* 453 F.Supp. 651, 659 (E.D.Cal.1977)).

11. RP's argument that its CERCLA claims are not claims for "damage" under § 702c, because "damage" only contemplates legal claims, and CERCLA claims are equitable, is meritless. RP plainly seeks to impose "liability" on the United States for "damage" caused by the flood water. RP cites no case that limits the word "damage" to legal claims, and such a reading is contrary to the Supreme Court's broad reading of the word "damage" in *James. See James,* 478 U.S. at 604– 06, 106 S.Ct. at 3121 (noting that statute covers *"any* damage" and "liability of *any* kind") (emphasis in original). Moreover, the Ninth Circuit has interpreted the term "damages" to include CERCLA claims. *See Aetna Casualty and Sur. Co. v. Pintlar Corp.,* 948 F.2d 1507, 1512–13 (9th Cir.1991) (interpreting insurance contract).

Section 9607, cross-referenced in § 9620(a)(1), is the liability section in CERCLA. For purposes of this discussion, the critical language appears in the very first sentence of § 9607, which establishes liability in certain categories of persons, including governmental entities, "[n]otwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section." Subsection (b) provides limited defenses for releases caused solely by an act of God, war, or of a third party in certain narrow circumstances. There is no immunity expressed for the United States and there is no cross reference to 33 U.S.C. § 702c or to any other immunity provision relating to the United States.

In combination, this language appears to expressly waive any immunity that the United States may have under any other statute or common law rule. In reviewing § 9620(a)(1), the Supreme Court noted that it is "doubtless an 'unequivoca[l] express[ion]' of the Federal Government's waiver of its own sovereign immunity, since we cannot imagine any other plausible explanation for this unqualified language." *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 10, 109 S.Ct. 2273, 2279, 105 L.Ed.2d 1 (1989) (citations omitted). But it is particularly the combination of the language in § 9620(a)(1) with that in § 9607 which appears to waive any immunity that the government might otherwise have. This is because § 9620(a)(1) subjects the United States to liability under § 9607, just like a private party, and § 9607 has a broadly worded waiver of any limitation on liability and a specific limitation of defenses to those expressly stated in the statute. In light of this language, it would appear that the statute does not impliedly, but rather, expressly waives any immunity that the United States could claim, including immunity under § 702c.

In response to this statutory language the government relies mainly on caselaw addressing the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2761 *et seq.,* and § 702c immunity. As the government notes, every circuit court to examine the issue has concluded that the FTCA did not impliedly repeal § 702c in the context of tort claims against the United States. *See National Mfg. Co. v. United States,* 210 F.2d 263, 270–75 (8th Cir.1954); *Clark v. United States,* 218 F.2d 446, 452 (9th Cir.1954); *Stover v. United States,* 332 F.2d 204 (9th Cir.1964); *Aetna Ins. Co. v. United States,* 628 F.2d 1201, 1205 (9th Cir.1980); *Taylor v. United States,* 590 F.2d 263, 266 n. 4 (8th Cir.1979); *Callaway v. United States,* 568 F.2d 684, 686 (10th Cir. 1978) (collecting cases from other circuits). The government argues that if the FTCA did not repeal § 702c immunity in the context of tort actions neither did CERCLA repeal the immunity in the context of a claim for environmental damage under CERCLA.

Although not without force, the government's reliance on the FTCA case law is not compelling in the context of CERCLA for two reasons. First, there is no language in the FTCA comparable to that contained in § 9607. The FTCA does treat the United States as liable in tort claims "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. This language is certainly similar to that contained in CERCLA at § 120(a)(1), and were there no further waiver the argument based on the FTCA caselaw might prevail. But § 9620(a)(1) specifically subjects the government to liability under § 9607, and that section has a sweeping renunciation of "any other provision or rule of law" that might impair liability and any other defenses other than those specifically listed. This language works an express repeal of all immunity, including § 702c, and there is no such language in the FTCA. Second, the FTCA has a revocation section, and § 702c was not included on it. *See* 60 Stat. 812, 842, 846–847. The absence of § 702c on the list of repealed statutes suggests that Congress did not intend that the FTCA would override § 702c. The Supreme Court relied on this reasoning in *United States v. James,* 478 U.S. 597, 598–600, 106 S.Ct. 3116, 3118, 92 L.Ed.2d 483 (1986) in noting that § 702c immunity survived passage of the FTCA. But there is no such comparable provision in CERCLA and thus no basis on which to argue that Congress intended to leave § 702c immunity untouched by CERCLA.

For these reasons, the court finds that although the immunity in § 702c applies to the operation and construction of the dams and power plant at issue in this case, this immunity has been waived by the Congress in §§ 107 and 120(a)(1) of CERCLA. The government's motion to dismiss on the basis that § 702c bars the claims relating to its operation of the dams and power plant is therefore denied.

### III.  *Immunity for Regulatory or Remedial Activities*

■ The United States and the State of California argue that CERCLA recognizes an immunity from suit for government entities when they act in a regulatory or remedial role. On this theory, they claim entitlement to immunity from RP's CERCLA counterclaims relating to operation of the dams because they have acted in a regulatory or remedial capacity in their operation of these facilities.[12] The State frames its argument in terms of the Eleventh Amendment while the United States relies on general principles of sovereign immunity, but the arguments are basically the same and rest on the same case law and statutory construction. Both the State and the federal government rely heavily on a policy argument that it would be unfair or unduly burdensome to expose a governmental entity to any liability for acts

taken to clean up pollutants not generated by the government and not located on government property even if the government's remedial response is grossly reckless or negligent. Whatever may be said on behalf of this position as a matter of policy, CERCLA does not incorporate such an immunity by its plain language and the court declines to create such an exemption where Congress has not done so and in the face of clear statutory language subjecting government entities to liability.

### A.  *Statutory Treatment of Government Actors*

The starting point in considering the assertion of an immunity for government remedial actions is the language and structure of the statute. CERCLA has a liability section at 42 U.S.C. § 9607 that places liability on "any person" who owns or operates a "facility" from which a release of hazardous substances occurs.[13]

The term "person" is perhaps the most basic building block in the CERCLA edifice. The definition provided in CERCLA is all inclusive and covers government entities:

The term 'person' means an individual, firm, corporation, association, partnership,

---

**12.** The State and United States argue that as to the Spring Creek Dam, their activities are "remedial," because one of the purposes of the dam and its operation is to control AMD emanating from Iron Mountain Mine. As to the other dams, the State and United States argue that their activities are protected by a more general "regulatory" exception to CERCLA liability for operation of a large water project. The State also asserts sovereign immunity under § 9601(20)(D) from suit as to any claims arising from its ownership of the streambeds.

**13.** Section 9607 provides:
(a) **Covered persons; scope; recoverable costs and damages** ...
Notwithstanding any other provision or rule of law, *and subject only to the defenses set forth in subsection (b) of this section,* [(1) owners, (2) operators, (3) arrangers, and (4) transporters,] shall be liable for—
(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;
(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and
(D) the costs of any health assessment or heal effects study. . . .
(b) **Defenses**
There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—
(1) an act of God;
(2) an act of war;
(3) an act or omission of a third party ... if the defendant establishes ... that (a) he exercised due care with respect to the hazardous substance concerned ... and (b) he took precautions against foreseeable acts or omissions of any such third party ...; or
(4) any combination of the foregoing paragraphs.
42 U.S.C. § 9607 (emphasis added).

consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body.

42 U.S.C. § 9601(21). The liability imposed on "any person" extends to all costs of removal or remedial action incurred by the United States, a state, or by any other person so long as these costs are not inconsistent with the national contingency plan. This liability is subject to certain limited and enumerated defenses set forth in subsection (b)—acts of God and of war and acts of third parties in certain narrow circumstances. As noted in the preceding discussion of § 702c immunity, § 9607 begins with the statement that liability applies under the section "notwithstanding any other provision or rule of law, and subject only to the defenses in subsection (b)," and there are no immunity defenses provided in subsection (b).

In addition to the liability section, there is also a provision in CERCLA for contribution among persons who share exposure to liability. Section 9613 provides that a person who has incurred response costs may seek contribution from "any other person" who is liable. Government bodies are therefore subject to contribution actions, as well as actions under § 9607, because government entities are within the definition of "person." In resolving contribution claims, CERCLA reposes broad discretion in the court to "allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613.

In several sections CERCLA specifically addresses the liability of government entities beyond its inclusion of such entities within the definition of "person." In what the Supreme Court describes as an unequivocal waiver of sovereign immunity, § 9620(a)(1) provides that the United States and all of its subdivisions "shall be subject to, and comply with, this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, *including liability under section 9607* of this title." 42 U.S.C. § 9607(a)(1) (emphasis added). Similarly, the states' Eleventh Amendment immunity is abrogated by the inclusion of the states within the definition of "person" and by § 9601(20)(D), which provides that the states shall have liability as "owners" and "operators" "in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, *including liability under section 9607* of this title." 42 U.S.C. § 9601(20)(D) (emphasis added).[14] *See Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989).

Moreover, CERCLA expressly addresses the liability of those who act in a remedial capacity, and who are otherwise not liable as owners or operators, and provides them with protection from strict liability:

> [N]o person shall be liable ... for costs or damages as a result of action taken or omitted in the course of rendering care, assistance, or advice in accordance with the National Contingency Plan ("NCP") or at the direction of an onscene coordinator appointed under such plan, with respect to an incident creating a danger to public health or welfare or the environment as a result of any releases of a hazardous substance or the threat thereof. This paragraph shall not preclude liability for costs or damages as the result of negligence on the part of such person.

42 U.S.C. § 9607(d)(1). This provision applies to governmental bodies because they are within the definition of "person." Indeed, the following paragraph makes it plain that governmental bodies are included within § 9607(d)(1) by providing a special standard of liability for state and local governments

---

**14.** 42 U.S.C. § 9601(20)(D) provides in full:

> The term 'owner or operator' does not include a unit of State or local government which acquired ownership or control involuntarily through bankruptcy, tax delinquency, abandonment, or other circumstances in which the government involuntarily acquired title by virtue of its function as a sovereign. The exclusion provided under this paragraph shall not

apply to any State or local government which has caused or contributed to the release or threatened release of a hazardous substance from the facility, and such a State or local government shall be subject to the provisions of this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 9607 of this title.

acting "in response to an emergency created by the release or threatened release of a hazardous substance generated by or from a facility owned by another person." In such instances, state and local governments are liable only for costs or damages resulting from their "gross negligence or intentional misconduct." 42 U.S.C. § 9607(d)(2).[15] There is no comparable provision for the federal government, leaving it liable for its own negligence under § 9607(d)(1).

Certain other provisions within CERCLA limit or refine the liability of a governmental entity when the entity acts in a remedial capacity. When a federal or state agency purchases or condemns real property in the course of a remedial action, no liability is incurred by the agency "solely as a result of acquiring an interest in real estate under this subsection," 42 U.S.C. § 9604(j)(3), and states and local governments are excluded from liability as "owners" and "operators" of a facility when ownership or control was acquired "involuntarily through bankruptcy, tax delinquency, abandonment, or other circumstances in which the government involuntarily acquires title by virtue of its function as sovereign." 42 U.S.C. § 9601(20)(D). In judicial review "of any issues concerning the adequacy of any response action taken or ordered" by the federal government, the government's choice of response actions can only be challenged under the "arbitrary and capricious" standard. 42 U.S.C. § 9613(j)(1) & (2).

Looked at as a whole, the statutory scheme suggests rather powerfully that there is no overarching, unexpressed remedial immunity for state or federal agencies. Government bodies are persons subject to liability under § 9607 "notwithstanding any other provision or rule of law." See Union Gas Co., 491 U.S. at 7-9, 109 S.Ct. at 2278 (§ 9607 evinces congressional understanding that "States would be liable in any circumstance described in [§ 9607(a) ] from which they were not expressly excluded"). Section 9607 recognizes only the defenses explicitly set out in subsection (b), and the limited

defenses there provided do not include any defense or immunity for a governmental entity acting in a remedial capacity. The statute reiterates at § 9620(a) and § 9601(20)(D) that the federal and state governments are liable just as private parties. The act provides a limitation on liability for all of those who act in a remedial capacity in certain circumstances, and expressly provides further protection to state agencies acting in an emergency. Where Congress saw fit to provide greater protection to governmental entities for remedial actions, CERCLA expressly provides for such limitation on liability. See, e.g., 42 U.S.C. § 9604(j)(3). Of course, were there an implicit, all inclusive immunity for state and federal government remedial activities, these sections would be unnecessary, and indeed would be in conflict with the immunity, for far from limiting liability, which is their apparent purpose, they would extend liability beyond the immunity that the United States and the State contend is incorporated into CERCLA. See Union Gas Co., 491 U.S. at 9-11, 109 S.Ct. at 2279 (discussing § 9607(d)(2) and noting that Congress would not need to provide an exemption from liability unless there would otherwise be liability). All of this suggests that there is no unexpressed, residual immunity for the states or the federal government when they act in a regulatory or remedial capacity.

Finally, this exposure to liability for negligent, reckless, or willful acts need not lead to intolerable consequences or exposure of the public fisc. Through the contribution section, CERCLA calls upon the court to equitably adjust the relative responsibility of different persons all of whom bear some liability for a release. Presumably where the government responsibility consists only of remedial action the share of liability will be adjusted accordingly. Moreover, the government body would only be liable were its activities such as to make it an "owner" or "operator" of the facility or otherwise bring the government within the terms of § 9607.

---

**15.** A like provision shelters persons who contract with the government to clean up a cite—known as "response action contractors"—from strict liability and limits the exposure of such contractors

to conduct "which is negligent, grossly negligent, or which constitutes intentional misconduct." 42 U.S.C. § 9619(a)(1) & (2).

In short, the clear language of CERCLA, its structure and its evident purpose to treat state and federal agencies no differently from private parties are inconsistent with a judicially created remedial immunity for government agencies.

### B. Remedial Immunity in the Case Law

Notwithstanding the clear language of the statute and its omission of a remedial defense, several federal district courts have recognized the immunity. *See United States v. Western Processing Co.*, 761 F.Supp. 725, 728 (W.D.Wash.1991) (claims based on EPA regulatory and cleanup activities barred by sovereign immunity); *United States v. Azrael*, 765 F.Supp. 1239, 1244 (D.Md.1991) (counterclaims based on EPA removal action barred by sovereign immunity); *Stilloe v. Almy Bros., Inc.*, 782 F.Supp. 731, 736 (N.D.N.Y.1992) (adopting reasoning of *Azrael* and *Western Processing*); *In re Paoli Railroad Yard PCB Litigation*, 790 F.Supp. 94, 97 (E.D.Pa.1992) (no waiver of immunity for claim that United States was liable as operator based on control of site during cleanup activities), *aff'd without opinion*, 980 F.2d 724 (3rd Cir.1992); *United States v. Berks Assocs.*, 1992 WL 68346 (E.D.Pa.1992); *United States v. Hardage*, 733 F.Supp. 1424 (W.D.Okla.1989), *aff'd in part, rev'd in part on other grounds*, 982 F.2d 1436 (10th Cir. 1992) (claims arising out of EPA's cleanup activities not supported by statutory waiver of sovereign immunity, though claims might be proper in recoupment); *United States v. Skipper*, 781 F.Supp. 1106, 1111–12 (E.D.N.C.1991); *see also United States v. American Color and Chem. Corp.*, 858 F.Supp. 445, 449–50 (M.D.Pa.1994) (counterclaims based on EPA removal action barred where government acts in regulatory, not business, capacity) (citing other cases listed here).[16] The court, with respect, must decline to follow these cases because they are fundamentally at odds with the language of CERCLA.

The above cited cases rely on several reasons for finding the immunity. To begin with, it is suggested that government entities should be treated differently from private parties because private parties do not clean up pollution caused by others while governmental bodies will step forward in such circumstances. But this is an unconvincing rationale because CERCLA does encourage private cleanup of pollution caused by others by exposing current owners to liability and at the same time providing them with a cause of action for the recovery of their costs. *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 841 (4th Cir.1992); *3550 Stevens Creek Assoc. v. Barclays Bank*, 915 F.2d 1355, 1357 (9th Cir.1990). In many instances private remediators will be current owners of property who had nothing to do with the creation of the hazardous waste problem that they must respond to. These private parties are not different in any significant respect from a government agency acting in a remedial capacity and CERCLA does not acknowledge such a difference but treats them in the same way.

It is also suggested in these cases that imposing negligence liability under CERCLA on governmental entities responsible for releasing pollution would shift the cost of the cleanup to the government and thus would thwart "Congress' intent to ensure that those who benefit financially from a commercial activity should internalize the health and environmental costs of that activity into the costs of doing business." *Azrael*, 765 F.Supp. at 1245; *see also Western Processing*, 761 F.Supp. at 729; *Atlas*, 797 F.Supp. at 421. One may doubt that this statement accurately expresses the principal purpose of CERCLA. If CERCLA can be said to have a central purpose, that purpose is to achieve cleanup. In doing so CERCLA may impose liability on parties who had little culpability in creating the contamination problem at is-

---

**16.** *United States v. Dart Industries, Inc.*, 847 F.2d 144, 145–46 (4th Cir.1988); *CPC Intern, Inc. v. Aerojet–General Corp.*, 777 F.Supp. 549, 577 (W.D.Mich.1991); *United States v. New Castle County*, 727 F.Supp. 854, 871–75 (D.Del.1989); and *State of New York v. Johnstown*, 701 F.Supp. 33, 35–36 (N.D.N.Y.1988), although relied on by the "remedial" cases just listed, are not "remedial" cases, because they analyze governmental CERCLA liability using § 9607(a) operator/arranger analysis, rather than applying a blanket "remedial" immunity based on an inferred congressional intent not to hold governmental entities liable for cleanup activities.

sue. This is frequently the case when a later owner becomes responsible for pollution released many years earlier, sometimes under different technology and under different industrial standards. There is no question that CERCLA places liability on new owners, but it does not work to internalize the costs of pollution into current operations in these situations. Indeed, there may be no current business operations, yet the current landowner will be liable. More importantly, even if it is critical to make polluters internalize the costs of their harmful activities, it does not follow that they should also internalize the costs of the government's negligent response during its cleanup efforts. At any rate, Congress has resolved these quite complex policy questions in CERCLA and the courts ought not upset the resolution on some other view.[17]

Another argument for holding governmental entities immune from liability for their negligent cleanup efforts is the supposition that Congress intended all challenges to remedial activities to be "addressed as part of a determination for consistency with the National Contingency Plan." *Western Processing*, 761 F.Supp. at 729. Under this theory, if the government's cleanup is faulty, the potentially responsible person can challenge the government's attempt to recover costs under § 9607(a)(4)(A), but cannot assert an independent contribution counterclaim under § 9613(f)(1). *Id.; Atlas*, 797 F.Supp. at 419–20; *Skipper*, 781 F.Supp. at 1112; *Azrael*, 765 F.Supp. at 1246; *Paoli*, 790 F.Supp. at 97. In *Skipper*, the Coast Guard had allegedly violated the NCP when it buried an oily sand mixture during a remedial action. Years later, the EPA returned to clean up the site and sued private landowners to recover its costs. The court dismissed the defendants' counterclaim based on the Coast Guard's negligent cleanup, finding that the sole remedy was to raise inconsistency with the NCP as an affirmative defense to the government's claim under § 9607(a)(4)(A), not to file a counterclaim under § 9613(f). *Id.* at 1112–13. The court noted that it would be "inconceivable" were the private party forced to bear the expense of the government's dereliction.[18] However, under *Skipper*'s holding, this "inconceivable" result is entirely possible, even likely, were the landowners themselves to have cleaned up the site as CERCLA encourages. If they had, their effort to seek contribution from all responsible parties, as provided by CERCLA, would be blocked by the remedial exception to liability in the case of the Coast Guard, and the "affirmative defense" of inconsistency with the NCP would provide no remedy at all. CERCLA resolves the matter by providing that government bodies are subject to liability and claims for contribution.

The cases recognizing remedial immunity for government agencies also suggest that to permit a claim for governmental negligence at a cleanup site would be tantamount to creating a "new negligence defense" to CERCLA liability when the government seeks to recover cleanup costs. *See Azrael*, 765 F.Supp. at 1245 & n. 12; *Western Processing*, 761 F.Supp. at 729. But CERCLA expressly provides that the government's choice of remedies can be challenged when it seeks to recover cleanup costs. *See* 42 U.S.C. § 9613(j). Further, a claim against another responsible party is not fairly viewed as a defense, certainly not when CERCLA

---

17. Apparently the Third Circuit could marshall no reason to uphold the remedial cases other than its feeling that they reached the right policy result. *FMC Corp. v. United States Dept. of Commerce*, 29 F.3d 833, 841 (3d Cir.1994) ("We do not mean to suggest that the [remedial cases] were decided wrongly.... We do not think that CERCLA's 'essential purpose of making those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created' is served by making the government liable for attempting to clean up wastes created by others.") (internal citation omitted); *see also* 29 F.3d at 841 n. 6 (one judge refusing to join in this statement on ground that question was not before the court).

18. "The court finds it inconceivable that the Government would be able to shield itself from liability for improper burial of hazardous waste ... the ironic and unfair result of such a shield would be that Counter–Claimants would have to reimburse the Government for the cleanup of a hazardous mess created by the Government. As the court has also noted, however, CERCLA does provide for the fair resolution of improper remedial efforts through 42 U.S.C. § 9607(a)(4)(A)." *Id.* at 1115.

provides for contribution and does not deem one responsible party's effort to gain contribution in any sense as a defense. Rather, the immunity itself is a new defense to government liability, one not provided for by the statute.

Another theme running through the cases recognizing remedial immunity is that since the statute does not clearly authorize a cause of action against the government acting in a remedial or regulatory capacity, and since waivers of sovereign immunity must be strictly construed, sovereign immunity bars such a claim. *See Azrael,* 765 F.Supp. at 1244–45; *Skipper,* 781 F.Supp. at 1111–12; *Paoli,* 790 F.Supp. at 96; *Western Processing,* 761 F.Supp. at 728. This argument founders on its first assertion. CERCLA does provide for a claim against governmental agencies and instructs that they are to be treated like private parties except in a few instances where some greater protection is provided to government bodies acting in a sovereign capacity. One may construe waivers of sovereign immunity narrowly, but the statute must be read fairly and its "cascade of plain language" emphatically waiving sovereign immunity must be acknowledged. *See Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 9–11, 109 S.Ct. 2273, 2279, 105 L.Ed.2d 1 (1989).

The remedial cases must overcome the hurdle to absolute immunity for remediators posed by § 9607(d)(1) and its provision for liability by such persons when costs or damages result from their negligence. These cases argue that the provision for liability should not be read to suggest that a claim may be brought *under CERCLA* against a negligent person who undertakes to act in a remedial capacity but only "clarifies Congress' intent that the CERCLA remedial scheme not be viewed as occupying the field to the exclusion of tort claims" that could be brought under state law. *Skipper,* 781 F.Supp. at 1112; *Western Processing,* 761

F.Supp. at 729–30. Under this view, § 9607(d) would not appear to permit an action under CERCLA against a person who negligently acts in a remedial capacity. This reading is not persuasive. The first sentence of § 9607(d)(1) begins: "Except as provided in paragraph 2, no person shall be liable under this subchapter for costs or damages...." 42 U.S.C. § 9607(d)(1). Thus, the first sentence refers to CERCLA liability for "costs or damages." The very next sentence provides that "[t]his paragraph shall not preclude liability for costs or damages as the result of negligence on the part of such person." The remedial cases read this second reference to "liability for costs or damages" as referring to liability under state tort law. This reading is made possible only because Congress chose not to repeat the phrase "under this subchapter" in the latter sentence when it appeared in the immediately preceding sentence. Yet surely the reference in the second sentence is to "costs or damages" under CERCLA and not state law, a subject never mentioned. Moreover, if the statement "[t]his paragraph shall not preclude liability for costs or damages as a result of negligence" were merely a "clarification" of Congress' intent not to preempt state law, it would be entirely superfluous; the subject of preemption is expressly dealt with elsewhere and comprehensively in § 9614 of CERCLA.[19] Finally, § 9607(d)(2)'s partial exemption of state and local governments from the negligence standard that would otherwise apply demonstrates that § 9607(d)(1) sets a standard of negligence liability for remedial actions, including government remedial actions, because otherwise there would have been no need for the exemption in (d)(2). *See* 42 U.S.C. § 9207(d)(1) & (2); *see also Union Gas Co.,* 491 U.S. at 9–11, 109 S.Ct. at 2279 (§ 9607(d)(2) "is, needless to say, an explicit recognition of the potential liability of States under this statute").[20]

---

**19.** "Nothing in this chapter shall be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to the release of hazardous substances within such State." 42 U.S.C. § 9614(a).

**20.** The interpretation in text is supported by the legislative history of the 1986 amendments to

CERCLA, the Superfund Amendments and Reauthorization Act of 1986 (SARA). As indicated by the House Conference Report, the House version of the new section 9607(d) specifically considered including the federal government in the protection of section 9607(d)(2), but the final Conference substitute provided a heightened

A last theme that runs through some of the cases endorsing immunity for government remedial activity is reliance on Congress' rejection of a proposed amendment by Senator Helms "that would have added government misconduct and negligence as a separate defense to CERCLA liability." *Skipper*, 781 F.Supp. at 1112; *Western Processing*, 761 F.Supp. at 730; *Atlas*, 797 F.Supp. at 415 n. 6. This rejection is said to support the view that Congress did not intend that governmental agencies would be liable for their remedial activities. This argument confuses rejection of a defense to liability with conferral of immunity. That Congress did not wish to provide a polluter with a *defense* to CERCLA liability because of the government's negligence does not at all suggest that it intended to exempt the government from all liability for its proportionate share. Indeed, it suggests just the reverse. As discussed above, CERCLA throws a broad liability net and relies on the courts' sense of equity to apportion the costs of cleanup. Consistent with this scheme it would be surprising if Congress exempted an otherwise responsible person from all liability—whether that person is a governmental body or a private polluter—merely because some other person was also responsible. That is a common situation contemplated by CERCLA, and the rejection of the Helms Amendment does nothing to support the argument that the government should be immune from liability when it negligently causes harm to the environment during a remediation process.[21]

In short, Congress had the liability of governmental entities firmly in mind when it enacted CERCLA. The statute sets forth a general rule that governmental entities are to be liable to the same extent as private parties. 42 U.S.C. §§ 9601(20)(D) (states), 9620(a)(1) (federal government). The liability provision, § 9607(a), does not differentiate between governmental and private entities in describing the four classes of responsible persons, although it does differentiate between them in defining recoverable costs.[22] Neither does § 9607(d)(1) provide for special treatment for governmental entities: it provides that "no person" shall be liable for rendering care at a CERCLA site, but that liability is not precluded for costs or damages as the result of negligence on the part of such person. · 42 U.S.C. § 9607(d)(1). Section 9607(d)(2) provides additional protection to state or local governments who respond to emergencies caused by releases from facilities owned by others; they are still liable, and therefore not immune, but only for gross negligence or intentional misconduct. 42 U.S.C. § 9607(d)(2).

Based on this "cascade of plain language," [23] the court holds that there is no "regulatory" or "remedial" exception to CERCLA liability. Where a governmental entity's "regulatory" or "remedial" activities, of whatever nature, bring the entity within the definition of the terms "owner," "operator," "arranger", or "transporter," as those terms are applied to private parties, the government will be liable. Further, when a government agency undertakes to remediate

standard only for State and local governments. H.R.Conf.Rep. No. 962, 99th Cong., 2d Sess. 203–204 (1986), reprinted in 1986 U.S.C.C.A.N. 3276, 3296–97. A further indication that Congress knew that amending § 9607(d) would affect governmental CERCLA liability for negligence in remedial activities is found in an earlier House Report 99–253(I) discussing an amendment to § 9607(d) and which states: "[t]he section modifies the potential liability of Federal, State and local governments that respond to emergencies created by the release of a hazardous substance ... from a facility owned by another person.... So long as a Federal, State or local government acts in a non-negligent way when undertaking an emergency action to abate a hazard under CERCLA, that government will not be subject to the *same liability provisions applicable to the parties that created the hazard.*"

H.R.Rep. No. 253, 99th Cong., 1st Sess., pt. 1, at 73 (1985), reprinted in 1986 U.S.C.C.A.N. 2835, 2855 (emphasis added).

**21.** In any event, the argument based on the rejection of the Helms Amendment, which was a proposed amendment to the original CERCLA statute, loses all force in light of SARA, which added § 9607(d)(2).

**22.** 42 U.S.C. § 9607(a). Private parties are restricted to recovery of "necessary" response costs, while governmental entities may recover all costs; however, neither party may recover for costs inconsistent with the NCP. *Id.*

**23.** *Union Gas Co.*, 491 U.S. at 9–11, 109 S.Ct. at 2279.

a site within the terms of § 9607(d), it will face liability under the standards set forth in that section. The United States' and State of California's motions to dismiss RP's claims as barred by immunity for government acts undertaken in a regulatory or remedial capacity are denied.[24]

## IV. The United States' Activities During and After World War II

The United States also moves to dismiss the claims related to its activities at Iron Mountain during and after World War II. The United States argues that the activities alleged are insufficient to make it an "operator," "arranger" or "transporter" under CERCLA. (United States Mem. at 2–3.)

RP does not contend that the United States was an owner or transporter at the mine during or after World War II. (RP Opp'n—U.S. at 41, claiming only operator and arranger liability.) Thus, the motion to dismiss is granted to the extent that the counterclaims allege owner or transporter liability based on government activities at the mine during and after World War II. It remains to discuss RP's claims that the United States was (1) an "operator" and (2) an "arranger" with respect to the mine.

### A. "Operator" Liability

■ CERCLA defines an "owner or operator" as "any person owning [or] operating" a facility. 42 U.S.C. § 9601(20)(A).[25] RP claims that the United States' activities at the mine during World War II make the government liable as an "operator" under CERCLA. Although "the circularity of [the] definition [of operator] renders it useless," it is well settled that " 'operator' liability under section 9607(a)(2) only attaches if the defen-

dant had authority to control the cause of the contamination at the time the hazardous substances were released into the environment." *Kaiser Aluminum v. Catellus Dev.*, 976 F.2d 1338, 1341 (9th Cir.1992) (citation omitted); *Lincoln Properties, Ltd. v. Higgins*, 823 F.Supp. 1528, 1534 (E.D.Cal.1992). *See also Long Beach Unified School Dist. v. Dorothy B. Godwin California Living Trust*, 32 F.3d 1364, 1367 (9th Cir.1994) (to be liable as an operator one must "play an active role in running the facility, typically involving hands-on, day-to-day participation in the facility's management").

RP points to several factual allegations in the complaint that it contends support its claim that the United States operated the mine during World War II. First, RP alleges that the United States' regulatory encouragement of metals mining effectively "directed" Mountain Copper to mine copper, zinc and pyrite ore, "the only business available to it." (RP Opp'n—U.S. at 43.) The government did this by prohibiting gold mining and by institution of the Premium Price Plan, under which the government contracted to buy zinc and copper from the mine, controlled the marketing and pricing of the ore produced, and set prices to encourage maximum production. (*Id.* at 43–44.) In response, Mountain Copper built a new mill to process ore, and opened a new ore body at the mine. (*Id.* at 44.) RP contends that if production of pyrite ore at the mine had not increased, there was a strong likelihood that the mine would have been seized. (*Id.* at 45.) In addition, RP contends that the government took a variety of steps to assist production, particularly in the areas of labor and transportation. The government built roads on Iron Mountain to facilitate shipments

---

**24.** The State also argues that it cannot be liable based on its ownership of the streambeds of Spring Creek and the Sacramento River because of the exclusion from CERCLA liability for involuntarily acquired property. 42 U.S.C. § 9601(20)(D). The State received ownership of these streambeds under the "equal-footing doctrine," which provides for the states' acquisition of the navigable waters within their borders on admission to the Union. *See Utah Div. of State Lands v. United States*, 482 U.S. 193, 196, 107 S.Ct. 2318, 2320–21, 96 L.Ed.2d 162 (1987). The State may well be correct that the streambeds fall within § 9601(20)(D) as property

acquired in "circumstances in which the government involuntarily acquires title by virtue of its function as sovereign." *Id.* Nonetheless, the exclusion of liability provided in § 9601(20)(D) does not apply if the State "has caused or contributed" to the release of a pollutant. Because it is not possible to decide this issue on a motion to dismiss, the motion to dismiss the ownership claim is denied.

**25.** A "facility" is "any site or area where a hazardous substance has been deposited...." 42 U.S.C. § 9601(9).

from the mine, hired new employees to work in the mine, granted deferments to mine workers, fixed mine workers' wages and imposed minimum work weeks, and prevented employees from seeking employment elsewhere without a certificate of separation. (*Id.* at 46.)

Even assuming the historical accuracy of these assertions, the complaint does not state a cause of action for "operator" liability under CERCLA. Although the United States certainly played the role of a very interested consumer during the War, RP's counterclaim is bereft of any allegations that the United States was involved in the "hands-on, day-to-day" management of the mine, *Long Beach Unified School Dist.*, 32 F.3d at 1367, or that the United States controlled the cause of contamination, the mining equipment, or made any decisions regarding disposal of the mining waste. *Kaiser*, 976 F.2d at 1341. Nor are there any allegations that the United States supplied the mine with mining equipment or any other materials. Purchasing a product and encouraging its production are not the same as controlling the cause of the contamination or managing the mine.

Thus, the allegations in this case fall far short of the facts in *FMC Corp. v. United States Dept. of Commerce*, 29 F.3d 833 (3d Cir.1994), the case upon which RP principally relies. In *FMC* the Third Circuit held the United States liable as an "operator" for its World War II activities at a facility that produced high tenacity rayon for use in airplane and truck tires. But unlike the activity here, amounting to encouragement and regulation, in *FMC* the government also leased and installed equipment at the facility, built an adjacent factory to supply the rayon plant with sulfuric acid, commissioned the building of another plant to produce carbon bisulfide for the rayon facility, and required the operator of the rayon plant to use those raw materials for the specific purpose of making high tenacity rayon. By its distribution of raw materials, the government "determined the operating level" of the rayon plant. Moreover, the government's management of the work force and day to day plant operations far exceeded what is alleged here. In the *FMC* case the government participated in managing and supervising the workers, *id.* at 837, "appointed a full-time representative to ... address problems at the facility concerning manpower, housing, community services, and other related matters," and "placed a representative on-site with the authority to promulgate rules governing all operations at the site and to remove workers who were incompetent or guilty of misconduct." *Id.* In *FMC*, "[t]hrough continuous informal contacts and communications, the government was involved directly and substantially with the facility's production activities and management decisions." *Id.* Finally, the government had direct involvement in the generation of waste: "the government knew that generation of waste inhered in the production process; it was aware of the methods for disposal of the waste; and it provided the equipment for the waste disposal." *Id.* at 838. Thus, the government's activities in *FMC* amounted to "substantial control over the facility" and "active involvement in the activities there," and were sufficient to create operator liability. *Id.* at 843 (internal citation and quotation marks omitted). By comparison, RP's allegations here fall short of placing the government in a position of day to day management with control over waste disposal and mining practices. *See United States v. Vertac Chem. Corp*, 46 F.3d 803, 809 (8th Cir.1994) (holding United States not liable as operator or arranger of Agent Orange production facility based on regulatory activities despite directing increased production and assisting in procurement of, but not providing, raw materials, because government was not "actively involved on a regular basis in, and thus never exerted substantial control over" the facility).

RP's allegations regarding post-World War II operation of the mine also fall short of establishing operator liability. RP alleges that after the war, the mining and milling of copper and zinc ore ceased, but the government continued its involvement with the mine by paying for equipment and operations in conducting explorations for new ore and by participating in decisions as to the best methods to search for new ore. (RP Countercl.— U.S. ¶ 39.) But RP does not allege that these explorations resulted in any production or release of hazardous wastes, and RP

states that the mining had finished at the end of the war. (RP Opp'n—U.S. at 14.)

For the foregoing reasons, RP's claims that the United States is liable under CERCLA as an "operator" of Iron Mountain Mine based on its activities during and after World War II are dismissed without prejudice for failure to state a claim upon which relief can be granted.

### B. "Arranger" Liability

■ Nor do RP's allegations support "arranger" liability under CERCLA. CERCLA "arranger" liability applies to "any person who by contract, agreement, or otherwise arranged for disposal or treatment [or transport] of hazardous substances owned or possessed by such person, by any other party or entity, at any facility...." 42 U.S.C. § 9607(a)(3). Although the wording of this provision is inartful, it predicates arranger liability on ownership or possession of the hazardous substances. *See Vertac*, 46 F.3d at 810–11 (arranger liability requires ownership or possession).

The facts alleged in the complaint fail to establish arranger liability in the United States because of its activities at the mine. RP does not allege that the United States owned the mining wastes from the mine. As discussed above, RP does allege that the United States prohibited gold mining at Iron Mountain, established a price incentive plan, inspected the mine and had some involvement with hiring workers for the mine. But the complaint does not allege that the government operated the mine in such a way that it could be said to possess the waste from the mine. And there are no additional allegations that would suggest that the government ever possessed the mining waste.

It is true that some cases impose arranger liability on parties who did not literally own or physically possess hazardous waste at the time that it was disposed of or released. But in each of these cases the party either was the source of the pollution or managed its disposal by the arranger. *See, e.g., Cadillac Fairview/California, Inc. v. United States*, 41 F.3d 562, 565–66 (9th Cir.1994) (holding rubber companies potentially liable for arrangement to dispose of contaminated styr-

ene despite having sold styrene to processor before contaminants were removed); *Catellus Dev. Corp. v. United States*, 34 F.3d 748, 752–53 (9th Cir.1994) (holding seller of waste batteries liable as arranger despite lack of control over eventual disposal of hazardous waste); *Jones–Hamilton v. Beazer Materials & Services*, 973 F.2d 688, 694–95 (9th Cir. 1992) (holding supplier and owner of raw materials liable for contamination at formulator's plant) (following *United States v. Aceto Agr. Chem. Corp.*, 872 F.2d 1373 (8th Cir. 1989)); *United States v. Northeastern Pharmaceutical & Chem. Co. ("NEPACCO")*, 810 F.2d 726, 743 (8th Cir.1986) (holding plant supervisor personally liable for arranging for hazardous waste disposal of corporation), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *Transportation Leasing Co. v. State of California (CALTRANS)*, 861 F.Supp. 931, 955 (C.D.Cal.1993) (holding municipalities liable for contracting with private companies to haul residential waste because they had duty to dispose of waste and exercised control over manner of disposal, and this conduct amounted to constructive possession of waste).

No court has imposed arranger liability on a party who never owned or possessed, and never had any authority to control or duty to dispose of, the hazardous materials at issue. *See, e.g., General Elec. Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281, 286 (2d Cir.1992) ("it is the *obligation* to exercise control over hazardous waste disposal, and not the mere ability or opportunity to control the disposal of hazardous substances that makes an entity an arranger under CERCLA's liability provision") (emphasis in original). RP does not allege that the United States owned or supplied to the mine any materials that contained hazardous substances. Nor does RP allege facts tending to show that the United States "actually knew about, had immediate supervision over, and was directly responsible for arranging for the transportation and disposal" of the hazardous waste. *NEPACCO*, 810 F.2d at 743. Because the complaint does not allege facts showing that the United States owned or possessed the mine waste, the "arranger"

claims are dismissed without prejudice for failure to state a claim.

### V. State of California as Operator/Arranger of Dams

The State argues that RP's factual allegations are insufficient to state a claim for "operator" or "arranger" liability under § 107(a) of CERCLA. RP argues that the State is liable under this section both as an "operator" and an "arranger" for its participation in the construction and operation of the Shasta, Keswick, and Spring Creek dams and the Spring Creek Power plant. According to RP, the State has participated extensively in controlling releases from these facilities.

The State argues that its purely "regulatory" activities fall short of the "hands-on" control required for operator or arranger liability. The State argues that its agencies' 1959 meeting with the USBR, approval of the USBR's application for appropriation of water for the dams, and 1980 memorandum of understanding with the USBR is, not sufficient control over a hazardous waste facility to justify CERCLA liability. The State further argues that there is no "hands-on control" by the State, ability to make policy, or actual control of the releases from the dams.

█ The State's arguments challenge the accuracy of RP's allegations, not their legal sufficiency, and although these arguments might be appropriately considered on a motion for summary judgment, they do not provide a basis for dismissal on a 12(b)(6) motion. RP's allegations that the State actively participates in operating the Shasta, Keswick, and Spring Creek Dams in cooperation with the USBR are sufficient to state a claim for "operator" liability. In contrast to its allegations against the United States regarding its activities during World War II, RP has pled facts indicating that the State is involved in the day-to-day control of the dams and has authority to determine the timing and quantity of releases from the dams, especially from the Spring Creek Dam—activity that allegedly determines the concentration of sulfuric acid in the water of the Sacramento River. This is just the type of control that is required to create "operator" liability.[26]

█ However, RP's "arranger" claim is deficient, because RP has not adequately alleged that the State owned or possessed the hazardous waste in question. See, e.g., CPC Intern., Inc. v. Aerojet–General Corp., 777 F.Supp. 549, 577 (W.D.Mich.1991) (state not liable as arranger because there was no "arrangement" made between State agency and other defendants for remediation of groundwater contamination, and the agency had not possessed or controlled the hazardous waste in question); New Castle County, 727 F.Supp. at 871–75 (state agency not arranger based on regulation of types of waste disposed at site, absent nexus or relationship between state and actual owner or possessor of hazardous substance); State of New York v. Johnstown, 701 F.Supp. 33, 35–36 (N.D.N.Y.1988) (state not liable as arranger for failure properly to regulate the site by issuing or requiring permits, where State had no nexus with owners of hazardous substances). Because RP's arranger claim against the State is deficient, it is dismissed without prejudice for failure to state a claim.

### VI. RP's "Recoupment" Counterclaims

█ Under a theory of recoupment, a defendant in an action brought by the government may assert any counterclaim arising

---

26. Long Beach, 32 F.3d at 1367; Kaiser, 976 F.2d at 1341; cf. United States v. Dart Industries, Inc., 847 F.2d 144, 145–46 (4th Cir.1988) (state agency not owner or operator of hazardous waste site based on allowing disposal of waste at site in exchange for cleanup and monitoring of site; there was "no allegation that [the agency] went beyond this governmental supervision and directly managed ... employees or finances at [the site]," and no allegation that any "hands on activities by [the agency] contributed to the release of hazardous wastes"); United States v.

New Castle County, 727 F.Supp. 854, 868–70 (D.Del.1989) (state agency not operator based on initial site selection and regulation of types of waste disposed at site; these activities did not constitute "active, voluntary, 'hands on' participation in day-to-day management and operations" of site) (citation omitted). For purposes of the present motion, the court assumes that the dams are part of the "facility" for which the United States has incurred response costs and at which hazardous wastes are released, a point not briefed by the parties.

from the same transaction or occurrence as the government's action, even though the counterclaim otherwise would be barred by sovereign immunity or the statute of limitations were it brought as a separate action. The claim in recoupment may not exceed the government's recovery but may only offset it. Recoupment builds on the notion that the government waives sovereign immunity and the defense of the statute of limitations when it brings suit.[27] RP recasts its CERCLA and state-law counterclaims as additional "recoupment" counterclaims and seeks recovery from the State and the United States, up to the amount that the State or the United States may recover under CERCLA.

Recoupment has been recognized by several courts, including this court in a prior order in the present case, as an appropriate theory by which to assert counterclaims against a government plaintiff in a cost recovery suit under CERCLA.[28] These courts hold that when a governmental entity sues to recover response costs under CERCLA it waives its sovereign immunity as to all counterclaims arising under CERCLA or state law involving the same "transaction or occurrence" as the government's CERCLA claim, so long as the dollar amount of the counterclaims does not exceed the government's recovery for response costs. *See United States v. Iron Mountain Mines,* 812 F.Supp. 1528, 1551–52 (E.D.Cal.1993); *United States v. American Color and Chem. Corp.,* 858 F.Supp. 445, 450–51 (M.D.Pa.1994); *Berger v. City of*

*North Miami,* 820 F.Supp. 989, 992–94 (E.D.Va.1993); *United States v. Atlas Minerals and Chemicals, Inc.,* 797 F.Supp. 411, 421 (E.D.Pa.1992); *United States v. Shaner,* No. Civ.A. 85–1372, 1992 WL 154652, at *7 (E.D.Pa. June 15, 1992); *United States v. Amtreco, Inc.,* 790 F.Supp. 1576, 1581–82 (M.D.Ga.1992); *United States v. Montrose Chem. Corp.,* 788 F.Supp. 1485, 1490–91, 1493 (C.D.Cal.1992); *United States v. Ownbey Enterprises, Inc.,* 780 F.Supp. 817, 820 (N.D.Ga. 1991); *United States v. Nicolet, Inc.,* No. Civ.A. 85–3060, 1986 WL 15017, at *5 (E.D.Pa. Dec. 31, 1986); *United States v. Mottolo,* 605 F.Supp. 898, 910–11 (D.N.H. 1985). Although there is substantial disagreement regarding how to apply the "transaction or occurrence" test in the CERCLA context,[29] only one court has seriously questioned the underlying premise that recoupment counterclaims are properly allowed as a basis for diminishing the government's cost recovery in a CERCLA action. *See United States v. Keystone Sanitation Co.,* 867 F.Supp. 275, 282–84 (M.D.Pa.1994) (finding recoupment "a rather tortured concept in the context of a CERCLA § 107 cost recovery action," seemingly "inconsistent with the statutory scheme" of CERCLA but postponing final ruling on recoupment issue).

If the theory of recoupment is adopted in the context of a CERCLA action, the rather extraordinary exposure that results to governmental entities is evident. In the case of

**27.** Despite the sovereign immunity doctrine and the language of Rule 13(d), when the United States institutes an action, defendant may assert by way of recoupment any claim arising out of the same transaction or occurrence as the original claim in order to reduce or defeat the government's recovery. However, if defendant's claim arises from a different transaction or occurrence, then it is in effect an independent suit and it may be asserted as a setoff or a counterclaim only if the government has waived its sovereign immunity.

6 C. Wright, A. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1427, at 197–98 (2d ed. 1990) (footnotes omitted). *See* 3 J. Moore & R. Freer, *Moore's Federal Practice* ¶ 13.28, at 13-161—13-164 (2d ed. 1994).

**28.** Indeed, several of the same courts that find immunity in CERCLA for government agencies acting in a remedial capacity, then lift all immu-

nity by permitting claims in recoupment. *See, e.g., United States v. American Color and Chem. Corp.,* 858 F.Supp. 445 (M.D.Pa.1994); *United States v. Atlas Minerals and Chemicals, Inc.,* 797 F.Supp. 411 (E.D.Pa.1992). Although this reflects a consistent approach to statutory interpretation in the sense that neither the immunity nor recoupment are addressed in the language of the statute, the two theories seem in some conflict at least in terms of policy. To the extent that immunity for remedial acts is recognized because exposing the government to suit would be too inhibiting, recoupment, by lifting the immunity, would seem to vitiate whatever protection the immunity is designed to give.

**29.** *Compare, e.g., Iron Mountain Mines,* 812 F.Supp. at 1551–52 (applying liberal standard), *with Berger,* 820 F.Supp. at 994 (requiring "tight nexus" between recoupment claim and cost recovery claim and that recoupment claim be directly related to pollution of affected site).

the federal government, suit under CERCLA would expose it to counterclaims under state tort law for any of its activities during the cleanup. Whereas CERCLA provides that certain actions of the federal government are to be reviewed under a negligence standard or under the arbitrary and capricious standard, state law could well impose strict liability or some other standard. *See* 42 U.S.C. §§ 9607(d)(1) & 9613(j)(2).[30] A state entity would be exposed through recoupment to suit in federal court for state law claims that would normally be barred by the Eleventh Amendment and state sovereign immunity law.[31] The same inconsistency with standards set out in CERCLA could well arise. *See* 42 U.S.C. § 9607(d)(2) (state government liable in an emergency only for gross negligence). Although CERCLA waives sovereign immunity for actions against governmental agencies who are responsible for environmental injury, and subjects them as well to claims for contribution, there is nothing in CERCLA that addresses a recoupment remedy or suggests that by bringing a CERCLA action a government agency exposes itself to claims under other state or federal statutory and common law schemes as to which it would otherwise be immune from suit. Can this far reaching result have been intended by Congress in the enactment of CERCLA?

In attempting an answer to this question, it is helpful to consider the development of recoupment law. Although not exactly a "legal Lohengrin,"[32] the genealogy of recoupment as applied to CERCLA is not impressive. The theory appears to have been ex-

panded well beyond its modest antecedents and to have been stated in the treatises and some of the cases in much more general terms than at least Supreme Court case law would justify. Indeed, the Supreme Court has never authorized claims nearly so broad as the recoupment claims that courts have allowed in CERCLA actions, and the Supreme Court cases cited by the treatises do not appear to support the broad proposition for which they are cited.

The most cited Supreme Court case for the proposition that a defendant may assert in recoupment any claim arising out of the same transaction or occurrence as the government's claim is *United States v. United States Fidelity & Guar. Co.*, 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940). However, the *Fidelity* Court had no occasion to hold that recoupment claims were allowed up to the amount of the government's claim because the government had not contested the issue.[33]

The basis for the government's concession on the counterclaim in *Fidelity* was *Bull v. United States*, 295 U.S. 247, 55 S.Ct. 695, 79 L.Ed. 1421 (1935). In *Bull,* the Supreme Court allowed an executor to offset the government's claim for income tax deficiency with a claim for overpayment of estate tax based on the same transaction, despite that the limitations period for an action for refund of the estate tax had run. Unless the offset were permitted the taxpayer would have been taxed twice on the same transaction on inconsistent characterizations of the transac-

---

**30.** CERCLA does not preempt "any State from imposing any additional liability or requirements with respect to the release of hazardous substances within such State." 42 U.S.C. § 9614.

**31.** *See, e.g., Montrose Chem. Corp.*, 788 F.Supp. at 1493 (by bringing CERCLA action State waives both Eleventh Amendment and State law sovereign immunities).

**32.** *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1015 (2d Cir.1975) (Friendly, J.).

**33.** The Court stated: "[b]y concession of the Government the validity of so much of the Missouri judgment as satisfied the Indian Nations' claim against the lessee is accepted. This concession is upon the theory that a defendant may, without statutory authority, recoup on a counterclaim an amount equal to the principal claim."

*Fidelity & Guar. Co.*, 309 U.S. at 511, 60 S.Ct. at 656 (citing *Bull v. United States*, 295 U.S. 247, 261, 55 S.Ct. 695, 700, 79 L.Ed. 1421 (1935)). An example of the misplaced reliance upon *Fidelity* may be seen in *Livera v. First Nat'l State Bank of New Jersey*, 879 F.2d 1186 (3d Cir.1989), in which the court states: "[t]he Supreme Court has held that when the·United States institutes an action, a defendant may assert by way of recoupment any claim arising out of the same transaction or occurrence as the original claim in order to reduce or defeat the government's recovery." *Id.* at 1195–96. Although *Fidelity* is cited for this proposition, this language is actually a quotation from 6 *Federal Practice and Procedure* § 1427, quoted *supra;* there is no such language in *Fidelity*.

tion.[34] *Bull* may be understood as a statute of limitations case, standing only for the narrow proposition that if the government asserts inconsistent theories of taxation the statute of limitations will not bar reaching an equitable result as to a single transaction when the refund would otherwise be authorized by applicable federal law, rather than for the broad proposition that whenever the government brings suit, it waives its sovereign immunity as to all transactionally-related claims, irrespective of their source in federal or state statutory or common law.

This narrow reading of *Bull* is supported by subsequent Supreme Court cases. In *United States v. Dalm,* 494 U.S. 596, 602, 110 S.Ct. 1361, 1365, 108 L.Ed.2d 548 (1990), the Court noted that recoupment had only been upheld by the Court in *Bull* and *Stone v. White,* 301 U.S. 532, 57 S.Ct. 851, 81 L.Ed. 1265 (1937).[35] In *Stone* the Court permitted an equitable recoupment claim brought *by* the government, and thus *Stone* does not support the theory that recoupment waives all sovereign immunity.[36] In reviewing *Bull* and *Stone,* the Court in *Dalm* emphasized how narrow the doctrine of recoupment is:

> In sum, our decisions in *Bull* and *Stone* stand only for the proposition that a party litigating a tax claim in a timely proceeding may, in that proceeding, seek recoup-

ment of a related, and inconsistent, but now time-barred tax claim relating to the same transaction. In both cases, there was no question but that the courts in which the refund actions were brought had jurisdiction. To date, we have not allowed equitable recoupment to be the sole basis for jurisdiction.

*Dalm,* 494 U.S. at 608, 110 S.Ct. at 1368 (refusing to allow jurisdiction over refund claim when, in contrast to *Bull,* there was no timely claim for refund asserted by taxpayer); *see also Rothensies v. Electric Storage Battery Co.,* 329 U.S. 296, 302–03, 67 S.Ct. 271, 273–74, 91 L.Ed. 296 (1946) (declining to extend recoupment beyond single transaction in order to avoid undermining statute of limitations); *United States v. Nordic Village, Inc.,* 503 U.S. 30, 38–40, 112 S.Ct. 1011, 1017, 117 L.Ed.2d 181 (1992) (recognizing that *Dalm* "substantially narrowed" recoupment doctrine).[37]

Despite the narrowness of the Supreme Court holdings, however, the Courts of Appeals have found that recoupment waives sovereign immunity in a variety of contexts. The leading authority is *Frederick v. United States,* 386 F.2d 481 (5th Cir.1967). *See* 3 *Moore's Federal Practice* ¶ 13.28, at 13–162 n. 9 (citing *Frederick* as primary authority

---

**34.** "If the claim for income tax deficiency had been the subject of a suit, any counter demand for recoupment of the overpayment of estate tax could have been asserted by way of defense and credit obtained, notwithstanding the statute of limitations had barred an independent suit against the government therefor. This is because recoupment is in the nature of a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded. Such a defense is never barred by the statute of limitations so long as the main action itself is timely." *Bull v. United States,* 295 U.S. at 262, 55 S.Ct. at 700–01 (quoting *United States v. Ringgold,* 33 U.S. (8 Pet.) 150, 163, 8 L.Ed. 899 (1834)) (footnote omitted).

**35.** Thus, the Court itself does not recognize *Fidelity* as a recoupment case.

**36.** Recoupment has been accepted as a defense of general applicability for avoiding the statute of limitations in cases between private parties, where sovereign immunity is not a concern. *See Reiter v. Cooper,* —— U.S. ——, ——, 113 S.Ct. 1213, 1218, 122 L.Ed.2d 604 (1993) (citing appellate cases reaching same result).

**37.** In addition to the narrow recoupment theory endorsed in *Dalm* in the tax area, recoupment may also be permitted when the government seeks to recover funds held by one who has been paid by the government for services provided to the government. *See United States v. Ringgold,* 33 U.S. (8 Pet.) 150, 8 L.Ed. 899 (1834); *United States v. Macdaniel,* 32 U.S. (7 Pet.) 1, 8 L.Ed. 587 (1833). Similarly, in *United States v. Shaw,* 309 U.S. 495, 60 S.Ct. 659, 84 L.Ed. 888 (1940), the Court permitted a claim by a government contractor to offset the claim of the United States. The Court found authority for the offset not under some general theory of waiver or recoupment but under authority of the cross-claim statute, then 28 U.S.C. § 774 (the predecessor to the present 28 U.S.C. § 2406), which allowed a cross-claim up to the amount of the United States' suit. *Id.* at 501 n. 21, 60 S.Ct. at 661 n. 21 and accompanying text; *see also* 3 *Moore's Federal Practice* ¶¶ 13.27 & 13.28, at 13–160—13–161 (explaining that *Shaw* rejected general application of admiralty rule that bringing suit subjected United States to any counterclaim involving same subject matter).

for recoupment); 6 *Federal Practice and Procedure* § 1427, at 198–200 (quoting *Frederick* as statement of current recoupment doctrine). *Frederick* allowed the defendant guarantor of a Small Business Administration loan to raise as a counterclaim to the United States' action to recover on the guaranty the government's mishandling of the defendant's security interest. In allowing the counterclaim, the court held:

> Our conclusion is that when the sovereign sues it waives immunity as to claims of the defendant which assert matters in recoupment—arising out of the same transaction or occurrence which is the subject matter of the government's suit, and to the extent of defeating the government's claim but not to the extent of a judgment against the government which is affirmative in the sense of involving relief different in kind or nature to that sought by the government or in the sense of exceeding the amount of the government's claims.

*Frederick*, 386 F.2d at 488. Other circuits have followed *Frederick*,[38] perhaps including the Ninth Circuit,[39] and at least one appellate court has applied the doctrine to cases brought by a state in federal court.[40] Yet the foundation of *Frederick* is shaky at best. It relies on *Bull* and cases that in turn rest on *Bull*, and it was decided prior to *Dalm* in which the Supreme Court emphasized how narrow its recognition of recoupment had been in *Bull* and subsequent cases.

■ In light of this background, the court declines to extend the recoupment doctrine to CERCLA. Waivers of sovereign immunity may not be implied, *see Dalm*, 494 U.S. at 608, 110 S.Ct. at 1368, and CERCLA nowhere purports to waive a governmental agency's immunity from suit under other laws. Moreover, there is no compelling need for application of the recoupment doctrine in the context of a government cost recovery action under CERCLA because CERCLA itself permits the defendant in a suit by the government to seek contribution and make claims against the government. Furthermore, to permit a claim made under another legal regime, brought by way of recoupment, simply because the government brought suit under CERCLA, could well undermine CERCLA's scheme of allocating cleanup costs and of setting standards for liability for government activities.

■ In short, there is nothing in CERCLA that can be read to exact a waiver of governmental sovereign immunity from claims under other laws as to which it is immune as the price of bringing a cost recovery action under CERCLA. Recoupment doctrine, with its tenuous basis in the common law, cannot serve as a substitute for a clearly expressed congressional intent to subject the United States and California to state or non-CERCLA federal law counterclaims, as to which they would otherwise be immune, in the context of a CERCLA action, when CERCLA itself expressly limits its waiver of sovereign immunity to CERCLA counterclaims.[41]

---

**38.** *See, e.g., United States v. Forma,* 42 F.3d 759, 764 (2d Cir.1994); *Livera v. First Nat'l State Bank of New Jersey,* 879 F.2d 1186 (3d Cir.1989); *United States v. Johnson,* 853 F.2d 619 (8th Cir. 1988); *Cox v. Kurt's Marine Diesel of Tampa, Inc.,* 785 F.2d 935 (11th Cir.1986); *Federal Deposit Ins. Corp. v. Citizens Bank & Trust Co.,* 592 F.2d 364, 373 (7th Cir.), *cert. denied,* 444 U.S. 829, 100 S.Ct. 56, 62 L.Ed.2d 37 (1979); *United States v. 2,116 Boxes of Boned Beef,* 726 F.2d 1481 (10th Cir.1984); *United States v. Irby,* 618 F.2d 352 (5th Cir.1980).

**39.** In *United States v. Lockheed L–188 Aircraft,* 656 F.2d 390, 395 n. 11 (9th Cir.1979), and *Spawr v. United States,* 796 F.2d 279, 280–81 (9th Cir.1986), the court cited *Frederick* with approval. Additionally, the court sanctioned a recoupment claim in *United States v. Agnew,* 423 F.2d 513 (9th Cir.1970) even though the claim involved a separate transaction. The court stated

generally that "a counterclaim may be asserted against a sovereign by way of set off or recoupment to defeat or diminish the sovereign's recovery." *Id.* at 514.

**40.** *See, e.g., Genentech, Inc. v. Eli Lilly and Co.,* 998 F.2d 931, 946–47 (Fed.Cir.1993). However, the Supreme Court has never applied the recoupment doctrine against a state to lift the state's immunity under the Eleventh Amendment.

**41.** 42 U.S.C. §§ 9601(20)(D), 9601(21), 9620(a). Nor is the fact that a counterclaim would be compulsory under Rule 13(a) enough to support a waiver of sovereign or Eleventh Amendment immunity. *See Chemehuevi Indian Tribe v. California State Board of Equalization,* 757 F.2d 1047, 1053 (9th Cir.1985) (Rule 13(a) is not a waiver of sovereign immunity), *rev'd on other grounds,* 474 U.S. 9, 106 S.Ct. 289, 88 L.Ed.2d 9

Thus, because RP's state law counterclaims [42] and "recoupment" counterclaims against California are not supported by any waiver of the State's Eleventh Amendment immunity, they are dismissed. Similarly, to the extent that RP proceeds against the United States under state or federal common law by way of "recoupment" or "indemnification," those claims are dismissed.[43] Finally, because RP's CERCLA "recoupment" counterclaims against the United States and California are redundant to affirmative counterclaims that the court has allowed to proceed under CERCLA, those "recoupment" claims are dismissed.

## VII. *Conclusion*

For the above stated reasons:

(1) RP's and IMMI/Arman's claims against the United States for its activities at the mine during and after World War II are dismissed for failure to state a claim under CERCLA. RP and IMMI/Arman may seek leave to amend to allege facts sufficient to state a claim under CERCLA based on these activities if there are other facts not included in the current counterclaims that would support such a claim;

(2) The "common law" and "recoupment" claims against the United States are dismissed because they are barred by sovereign immunity;

(3) The motion by the United States to dismiss RP's and IMMI/Arman's claims under CERCLA is denied. The court holds that the United States is not immune under the Flood Control Act and that CERCLA does not extend remedial or regulatory immunity to the United States;

(4) RP's CERCLA claim against California for "arranger" liability is dismissed without prejudice for failure to state a claim;

(5) California's motion to dismiss RP's CERCLA claim for "operator" liability is denied, because the facts alleged are sufficient to state a cause of action under CERCLA, and because the "remedial" and "regulatory" exception advanced as a basis for dismissal is unsupported by the language of CERCLA or its legislative history;

(6) California's motion to dismiss RP's CERCLA claim for "owner" liability is denied, because the "sovereign function" exception will not protect it if it is liable on RP's "operator" claim; and

(7) All of RP's state law and "recoupment" claims against California are dismissed, because they are barred by California's Eleventh Amendment immunity, which California did not waive by bringing this CERCLA cost recovery action.

IT IS SO ORDERED.

---

(1985); Federal Rule of Civil Procedure 13(d); cf. *County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 250–51, 105 S.Ct. 1245, 1259–60, 84 L.Ed.2d 169 (1985) (ancillary jurisdiction over state does not support waiver of Eleventh Amendment immunity absent clear expression of consent to suit).

**42.** RP did not argue any basis for a waiver of Eleventh Amendment immunity as to its separate state law counterclaims other than recoupment. Thus, all of RP's state law counterclaims are dismissed.

**43.** This disposition requires the dismissal of the recoupment counterclaims previously allowed by Judge Schwartz. *See* 812 F.Supp. at 1551–52.